Filed 5/28/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CONCHITA FRANCO SERRI,<br><br>　　Plaintiff and Appellant,<br><br>v.<br><br>SANTA CLARA UNIVERSITY ET AL.,<br><br>　　Defendants and Respondents. | H037534<br>(Santa Clara County<br>Super. Ct. No. 107 CV 088296) |

Plaintiff and appellant Conchita Franco Serri brought this action against her former employer (defendant and respondent Santa Clara University (the University)) and other individually named defendants after the University terminated her employment. Serri had worked as the University's Director of Affirmative Action since 1992. The University terminated her employment in 2007 because she failed to produce Affirmative Action Plans for three consecutive years, even though her job required that she produce an Affirmative Action Plan annually. The University also terminated her employment because she made misrepresentations about the Plans that she had failed to prepare.

Notwithstanding Serri's failure to produce the required Plans—and the misrepresentations she made about the nonexistant Plans—Seri filed a complaint alleging that she was wrongfully discharged from her employment based on her race and ethnic origin. Her complaint also contained causes of action for breach of her employment contract, retaliation and harassment in violation of the California Fair Employment and

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II., IV.G., IV.I., IV.J., and IV.K. of the Discussion.

Housing Act, violation of the federal Equal Pay Act, defamation, intentional and negligent infliction of emotional distress, and interference with prospective economic advantage. The defendants moved for summary judgment, or in the alternative, summary adjudication of each of Serri's causes of action.

We are asked to determine whether an employee who is terminated for failing to perform an important job function can avoid summary judgment by arguing, based on expert evidence obtained for the purpose of opposing a motion for summary judgment or summary adjudication, years after the employee's termination, that the failure to perform did not and would not result in any adverse consequences to the employer. We hold that after-acquired expert evidence that there were no adverse consequences from an employee's failure to perform does not create a triable issue of fact on the question whether the employee failed to perform his or her job duties and thus has limited relevance, if any, to the question of discrimination.

In this case, expert evidence that the failure of performance did not harm the University, acquired years after Serri was terminated, did not create a triable issue of material fact on the question whether the University's stated reasons for terminating Serri were untrue or pretextual such that a reasonable trier of fact could conclude that the employer engaged in discrimination. Before she was terminated, Serri told the University her failure to prepare an Affirmative Action Plan could have adverse consequences, including the loss of federal grants. That the University ultimately suffered no adverse consequences did not create a triable issue on the questions whether the University had a legitimate, nondiscriminatory reason to terminate her employment or whether its reasons for doing so were untrue or pretextual. We also reject Serri's other contentions. Accordingly, we will affirm the summary judgment.

2

For almost 15 years, from the latter half of 1992 until March 2007, Serri was employed by the University as its Director of Affirmative Action. Her duties included handling and either mediating or investigating complaints filed by faculty, students, and staff under the University's anti-discrimination and anti-harassment policy, which the University refers to as "Policy 311." Serri's duties also included preparing the University's annual Affirmative Action Plan (sometimes AAP or Plan)[1] and providing sexual harassment training to University staff. Serri testified in deposition that since the University was a federal contractor, federal regulations required the University to prepare an annual AAP. In a memo she wrote in November 2005, Serri described the AAP as "pivotal and essential for us for obtaining and retaining federal grants." Serri, who is Puerto Rican, was 54 years old when the University terminated her employment.

At all times relevant to this case, defendant Father Paul Locatelli[2] was the President of the University, defendant Robert Warren was the University's Vice President for Administration and Finance, and defendant Molly McDonald was the University's Assistant Vice President of Human Resources. McDonald reported to Warren, and Warren reported directly to Father Locatelli. Until April 2006, Serri's also reported directly to Father Locatelli. McDonald supervised Serri from April 2006 until Serri's termination in March 2007.

Defendants John Ottoboni and Julie Veit are attorneys. Veit is Ottoboni's daughter. Before 2007, they both worked for a law firm that served as outside counsel to the University. In the fall of 2006, the University hired Ottoboni as its in-house general

---

[1] The document required by federal regulations was originally called the "Affirmative Action Plan." The name was later changed to "Affirmative Action Program." We shall use the phrase "Affirmative Action Plan" or the shortened forms "AAP" or "Plan" to refer to the report at issue, since that is how it is described in most of the record.

[2] Father Locatelli passed away on July 12, 2010.

counsel, effective January 1, 2007.  In late January 2007, Veit started working for the University as an in-house legal associate to the human resources department.  Veit reported to McDonald, not Ottoboni.

### *The University's Affirmative Action Plan*

Serri testified in deposition that there were three major components to the University's Affirmative Action Plan.  The first component had two parts:  (1) a narrative report that Serri prepared, and (2) several statistical analyses that her assistant Linda Jocewicz prepared based on data provided by the human resources department.  The AAP narrative contained the University's "critical self analysis" and discussed specific topics as required by the Code of Federal Regulations.  The statistical analyses part included a workforce analysis, a job group analysis, and an availability analysis ("an estimate of the number of qualified minorities and women available for employment" in specific job groups).  The other two components of the AAP were the "applicant flow" and the "glass ceiling part," which Serri testified she never prepared because she was never given the data she needed to complete those components.

### *Events in 2003 and 2004*

McDonald started working for the University in May 2003.  Shortly thereafter, Serri told McDonald that she had had difficulty obtaining the data she needed to complete the statistical portion of the AAP's from McDonald's predecessor.  McDonald promised her full cooperation and encouraged Serri to contact her if she encountered any problems with the human resources department.

Serri reported directly to Father Locatelli for many years.  In about 2003, Father Locatelli began considering changing their reporting relationship and having Serri report to McDonald instead.  Serri objected and wrote him a letter in December 2003, in which she explained why she did not believe it would be a good idea to make the Affirmative

4

Action Office part of human resources. In June 2004, Father Locatelli questioned Serri's role in investigating faculty complaints. After consulting with Ottoboni and Veit (who were then outside counsel), Father Locatelli advised Serri that the University needed to make changes in policies, procedures, and reporting relationships related to the Affirmative Action Office, but no such management changes were made in 2004 or 2005.[3]

### *Serri's Wage Complaint*

On November 7, 2005, Serri sent Father Locatelli a letter in which she complained about an "unjustifiable salary disparity" between her salary and that of Charles Ambelang, a male employee in the human resources department whose job functions Serri alleged were comparable to her own. Serri said she had informed McDonald of the salary disparity in March 2005. Her letter asked Father Locatelli to "remedy this inequity . . . without further delay."

### *April 6, 2006 Meeting Between Serri, Father Locatelli, McDonald, and Veit*

In 2006, Father Locatelli ultimately determined that he did not have sufficient time to manage Serri's department and decided that Serri would report directly to McDonald, but would provide him with monthly updates regarding her activities, thus creating what the parties referred to as a "dotted-line" reporting relationship between Serri and Father Locatelli.

Father Locatelli met with McDonald and Serri on April 6, 2006, to discuss the reporting changes and other issues. At that meeting, Father Locatelli reassured Serri that the change in their reporting relationship was not a demotion. He noted that other reporting changes were also taking place.

---

[3] In October 2004, Father Locatelli told Warren he wanted McDonald to take over management of the Affirmative Action Office, but no such change was made at that time.

Shortly after the April 6, 2006 meeting, Serri took a medical leave of absence from the University to have surgery. Serri returned from her medical leave on June 20, 2006. Shortly thereafter, the University offered to make an equity adjustment to her salary, increasing it from $104,000 to $118,350 per year retroactive to March 1, 2005, the date Serri first informed McDonald of the alleged salary disparity. The University also offered Serri a 3.5 percent merit increase for the 2006-2007 academic year, which brought her salary up to $122,492 per year effective July 1, 2006. At that time, the University was in the process of having an outside consultant, Mercer Human Resources Consulting (Mercer), review the salaries of certain University employees, including Serri's salary. As part of that process, McDonald asked Serri to prepare a written description of her job for Mercer, which Serri completed on June 21, 2006. The University told Serri that if Mercer determined that an additional salary increase was warranted, that increase would be made retroactive as well.

### Serri's June 2006 Discrimination Claim

On June 21, 2006, the same day the University offered to make an equity adjustment to Serri's salary, Serri made a formal written complaint against Father Locatelli and Warren under Policy 311. Serri's complaint against Father Locatelli alleged gender discrimination because she made $20,000 per year less than Ambelang;[4] she also claimed the wage disparity was a violation of the federal Equal Pay Act. Serri's complaint against Warren alleged that she felt threatened by him when he interfered with her investigation of a sexual harassment claim involving two employees of the Facilities Department in 2005.

---

[4] Policy 311 defines unlawful discrimination in part as conduct the denies " 'equal opportunities, privileges, or benefits to individuals based upon race, color, national origin, ancestry, sex . . . .' "

6

Since it would have been inappropriate for Serri to investigate her own claims, the University hired an independent investigator for these claims. University representatives asked Ottoboni, who was then outside counsel for the University, for a recommendation. Ottoboni recommended Steven Manchester, an attorney with over 35 years of experience. The University then hired Manchester to investigate Serri's claims.

On July 30, 2006, Manchester issued a written report in which he found that Serri's claims were without merit and that neither Father Locatelli nor Warren had violated Policy 311. Serri appealed Manchester's findings to the University's Board of Trustees (Board). The Board held a hearing on September 12, 2006. Serri, who was represented by counsel, presented documents and argument in support of her appeal. The Board affirmed Manchester's findings.

### Serri's Working Relationship with Veit

As Assistant Vice President for Human Resources, McDonald regularly worked with outside counsel, including Veit. From time to time Veit, who practiced employment law, gave the University legal advice on matters that Serri handled, including the investigation of complaints and sexual harassment training. Veit often attended McDonald's meetings with Serri. On September 26, 2006, McDonald sent Serri an e-mail suggesting that Veit attend their "regularly scheduled" biweekly meetings, to which Serri responded, "Brilliant idea, Molly! Let's do it."

### Serri Discloses Her Failure to Prepare Affirmative Action Plans

Father Locatelli asked to meet with McDonald and Serri in mid-October to discuss Serri's cases. To prepare for the meeting, Father Locatelli asked Serri to provide him with a written report by October 10, 2006, regarding the status of the cases she had handled between April and September 2006. The meeting was ultimately scheduled for October 13, 2006.

About a week before the meeting, on October 5, 2006, Serri filed discrimination claims against the University with the California Department of Fair Employment and Housing (DFEH) and the federal Equal Employment Opportunity Commission (EEOC). The claims alleged (1) discrimination on the basis of sex, race, and national origin; and (2) retaliation for complaining about discrimination and a violation of the Equal Pay Act.

On October 10, 2006, at one of her regular meetings with McDonald and Veit, Serri told McDonald that the University "had not had a defensible Affirmative Action Plan" for several years. Serri was upset that her assistant, Linda Jocewicz, had not been trained on certain computer software so she could access human resources data she needed to prepare the statistical analyses part of the AAP. Serri stated that during the entire time that she was the Director of Affirmative Action, she never received the data she needed to complete the AAP's. This was the first McDonald had heard of this and she immediately became concerned. McDonald agreed to provide Serri with whatever data she needed and Serri agreed to provide Veit with a copy of the most recent AAP. After Serri's disclosure, Warren became concerned that the University could lose certain government funding because it did not have a defensible AAP.

Serri and Father Locatelli exchanged a series of e-mails in preparation for their October 13, 2006 meeting. On October 12, 2006, Father Locatelli told Serri their meeting would include a review of her cases as of September 30, as well as the "current Affirmative Action [P]lan." He asked her to "bring the current Affirmative Action [P]lan and all plans for the last 10 years" to the meeting.

Serri responded via e-mail, stating in part, "In the spirit of open communication I must say that I find the tone of your emails hostile." She also stated, "To this date, I have never received the completed data we need to complete the Affirmative Action Plan, even though we have asked for it in the past numerous times. I am working on the current plan for this year. I will bring a draft and last year's. The industry standard is to destroy the AAP[']s that are over two years old." Father Locatelli responded, "Please let me clarify

8

so there is no misunderstanding. I am only trying to get the material that you promised to send me as well as information that I thought was readily available to you. My purpose is to be as prepared as possible in order to have a fruitful and effective meeting. [¶] It is unclear how my email could be read as 'hostile' and I am looking forward to a productive meeting tomorrow."

At the meeting on October 13, 2006, Serri produced two documents that were labeled "<u>DRAFT</u> . . . Affirmative Action Plan" covering the periods "February 2006 through January, [*sic*] 2007" and "November 1, 2006 through October 31, 2007."[5] The draft AAP's that Serri produced in October 2006 were 25-page narrative reports that documented the University's "policy of sustaining equal employment opportunity and implementing affirmative action efforts in conformity with" federal statutes and executive orders. Both documents contained multiple typographical and grammatical errors, incomplete sentences, and other errors. The University later learned that Serri created both draft AAP's the day before the October 13, 2006 meeting. In deposition, Serri admitted that she prepared the two draft AAP's the day before the meeting and that she did not inform either Father Locatelli or McDonald that she had done so.

At the October 13, 2006 meeting, Serri said: (1) she was not an expert in AAP's; (2) she needed to hire a consultant to help prepare the AAP's because the applicable regulations had changed; and (3) her assistant had failed to obtain the data she needed to prepare the statistical analyses part of the AAP from human resources. Serri repeated her

---

[5] There are discrepancies in the dates on both draft Plans. The cover page for the first draft AAP stated that it covered the period "March 1, 2006-February 2, 2006" (which appears to contain a typographical error), while the text of the first plan stated that it covered the period "February 2006 through January, [*sic*] 2007." The cover page for the second draft AAP contained the dates "November 1, 2006-October 31, 2007," while the text of the second Plan stated that it covered the period "October 1, 2006 through September 30, 2007." The time frames covered by the two Plans are not sequential and do overlap since both Plans cover the three- or four-month period from October or November 2006 through January 2007.

previous statement that the University had no current, defensible AAP; she also said the University was likely to be audited by the federal government and recommended the University hire Anna Maly, an AAP consultant, at a cost of $9,000, to revamp its AAP and to create a template for future AAP's. Prior to this meeting, Serri had never told McDonald she did not feel competent to prepare the AAP or that she need a consultant to help her prepare it.

In deposition, Serri testified that she started preparing AAP's in 1992 and that she prepared an AAP each year between 1992 and 2000.[6] Serri also testified that the last time she prepared the narrative portion of the AAP prior to October 2006 was in 2002 and that Jocewicz had prepared the statistical analyses for the AAP in 2005 and 2006, but not in 2004.

Father Locatelli, Warren, McDonald, Ottoboni, and Veit met on October 18, 2006, to discuss the problems related to the University's AAP. They decided that McDonald would take over the responsibility of completing the 2006 AAP. On October 19, 2006, McDonald sent Serri an e-mail informing her that she (McDonald) would be "facilitate[ing] the coordination of this year's Affirmative Action Plan" in light of Serri's statements that (1) the AAP was "incomplete and indefensible," (2) she was unable to "produce a defensible plan without hiring a consultant," and (3) it was likely the University would be audited. The reassignment of duties was also based on McDonald's review of the draft plans Serri had prepared and the fact that the University had not had an AAP since 2003. McDonald asked Serri to provide the exhibits and the statistical analyses that were referenced in the draft AAP's. She also informed Serri that she was asking University counsel to review the AAP.

---

[6] Serri testified that the University was not a federal contractor in 1992, that there was no requirement that it have an AAP at that time, that she learned that the University had become a federal contractor around 2000, and that she prepared the AAP's voluntarily prior to 2000.

Serri objected to the reassignment of her duties relating to the 2006 AAP in an e-mail dated October 20, 2006, stating that the preparation of the AAP was "one of those roles that define [her] position" and that she felt "compelled to protest this act to the EEOC as an act of retaliation." She stated that (1) regulations governing AAP's had changed; (2) since 2004, she has needed to hire a consultant to prepare an AAP that was defensible and complete in light of the new regulations; (3) Father Locatelli never gave her permission to hire a consultant; and (4) McDonald's predecessor had denied her "essential data" and computer training needed to complete past AAP's. Serri also blamed the problem with the AAP's on Father Locatelli's "unwillingness to communicate" with and supervise her for six years.

### Serri's October 2006 Claims

On October 20, 2006, Serri lodged a second complaint under Policy 311, in which she claimed that McDonald's assumption of responsibility for the AAP was an act of retaliation for Serri's prior Policy 311 and EEOC claims. On or about October 24, 2006, Serri filed a second claim against the University with the DFEH, which was forwarded to the EEOC, in which she claimed that taking away her "essential job function" of preparing the AAP was "a demotion" that was retaliatory in nature.

The University once again asked Ottoboni to recommend someone to investigate Serri's second Policy 311 claim. Since Manchester had found against Serri on her first claim and Serri had criticized his investigation, Ottoboni recommended the University retain Mark Fredkin, an attorney with over 25 years experience, to investigate Serri's second claim. The University hired Fredkin. Linda MacLeod, an attorney at Fredkin's firm, assisted with the investigation.

On October 23, 2006, Serri told McDonald that she no longer wanted Veit attending their meetings. But McDonald decided that Veit would continue to attend their meetings so they could discuss Serri's cases and projects with Veit present. She also

11

believed "it was important to have another person present for the conversations with Ms. Serri in light of past disagreements about what had transpired in earlier discussions." Veit attended only two or three more of Serri's meetings with McDonald, all in the fall of 2006. On November 13, 2006, Serri added an allegation to her second Policy 311 claim that Veit's presence at her meetings with McDonald was an act of retaliation against her.

### Ottoboni and Veit Obtain Employment With the University

In 2006, the University decided to hire a full-time, in-house general counsel and offered Ottoboni the job. The University announced Ottoboni's appointment as general counsel in the fall of 2006 and he started working directly for the University on January 1, 2007.

In the latter part of 2006, McDonald recommended the University hire an in-house attorney for the human resources department who would report directly to McDonald. Warren approved and the University advertised the position in December 2006. Veit applied and was offered the job; she started working directly for the University in late January 2007. Serri's duties did not change after Veit was hired. Serri's job and Veit's job were and remained separate and distinct.

### Results of Second Investigation

On January 17, 2007, Fredkin and MacLeod issued a report in which they concluded that Serri had failed to meet her burden of proof on her retaliation claims. Serri appealed the decision to the Board and on February 13, 2007, the Board affirmed the investigators' findings.

### The University Terminated Serri's Employment

In October 2006, Warren recognized the seriousness of Serri's failure to complete the AAP's. He believed preparation of the AAP's was a "critical aspect" of Serri's job

and was concerned that the University could lose certain government funding because it did not have an AAP in place. Notwithstanding his immediate concerns, Warren decided not to make any decisions regarding Serri's employment until after the Policy 311 investigation and appeal were completed.

After the appeal of Serri's second claim was completed, Warren decided to terminate Serri. He made the decision himself instead of deferring to McDonald because he believed "Serri's misconduct to be sufficiently grave as to require [his] personal intervention." On March 7, 2007, Warren hand-delivered a letter to Serri, advising her that she was being terminated for three reasons: (1) her "failure to prepare, develop and implement the University Affirmative Action Plan for years 2003-2004, 2004-2005, and 2005-2006"; (2) her "failure to disclose to [her] supervisors the nonexistence of the University Affirmative Action Plans" for those years; and (3) her "misrepresentations related to the Affirmative Action Plans." Warren considered these acts to be "gross misconduct sufficient to warrant [Serri's] immediate termination" without corrective action. When he delivered the letter, Warren was accompanied by Ingrid Williams, an employee of the human resources department, who helped Serri gather her personal belongings.

After the University terminated Serri, it hired Deborah Hirsch, a woman from outside the University who was the same age as Serri, as the Director of Affirmative Action. Hirsch started working for the University in October 2007.

***Declaration of Linda Campbell***

In declarations, Linda Campbell, who had been the University's Director of Sponsored Projects for 12 years, stated that virtually all grant and contract applications the University submits to federal, local and state governments require the University to certify certain things, including that the University has completed its annual AAP. Prior to 2002, Serri personally signed the AAP certifications. But after Serri's office was

13

moved to another building in 2002, Campbell and Serri agreed that Campbell would sign the certifications. Campbell assumed Serri would notify her promptly if there was any reason she could not sign the certification forms. Campbell talked to Serri about the certifications two or three times a year; they communicated about them via e-mail and Campbell occasionally provided Serri with copies of documents the University was being asked to sign. From 2003 until 2006, the University certified on multiple occasions that it was in compliance with regulations requiring AAP's. As examples, Campbell attached copies of two grant applications the University submitted to two different federal agencies in December 2005 and March 2006, in which the University certified that it had developed an AAP as required by the rules and regulations of the Secretary of Labor. Both applications were signed by Don Dodson, the University's Vice Provost for Academic Affairs. One application requested grant funding in excess of $15 million. Campbell declared that during the relevant time frame, Serri never told her the University did not have an AAP.

On September 21, 2006, Campbell sent Serri an e-mail in which she wrote that the City of San José wanted a copy of the University's AAP "as part of our award paperwork for this year." Campbell asked Serri whether the University released its AAP. Serri responded that the University could not release its AAP because "it has proprietary, sensitive information that can compromise the University in case we get sued by job applicants. . . . We have never released it." Serri did not tell Campbell the University did not have an AAP and had not had one for three years. Serri offered to send Campbell "a summarized, sanitized version" of the AAP, but stated that "it is still not a good idea." In deposition, Serri testified that the "sanitized version" she mentioned in her e-mail was the narrative summary, like the draft AAP's she prepared in October 2006. Serri also testified that she knew people in the grants office were certifying that the University had an APP when in fact no AAP had existed for three years.

14

Serri filed her original complaint on June 20, 2007. The operative pleading is Serri's fourth amended complaint, which was filed in July 2008, after the trial court sustained Defendants' demurrers to previous complaints with leave to amend.

The fourth amended complaint (hereafter sometimes "complaint") alleges causes of action against the University for employment discrimination, tortious discharge, violation of the California Equal Pay Act (Lab. Code, § 1197.5), breach of an implied contract of continued employment, bad faith, and retaliation in violation of the FEHA (Fair Employment and Housing Act; Gov. Code, § 12940, subd. (h)). The complaint asserts causes of action against the University, Father Locatelli, McDonald, and Warren for defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress. The complaint includes a cause of action for harassment (Gov. Code, § 12940, subd. (j)) against the University, Father Locatelli, McDonald, and Veit. Finally, the complaint alleges a cause of action against Ottoboni and Veit for interference with prospective economic advantage.

The Defendants were divided into two groups represented by two separate lawyers: (1) the University and Father Locatelli were represented by attorney Allen Ruby; and (2) Warren, McDonald, Ottoboni, and Veit were represented by attorney Sonya Winner. We shall hereafter refer to Warren, McDonald, Ottoboni, and Veit collectively as the "Individual Defendants" and to all defendants collectively as "Defendants." Defendants answered the fourth amended complaint in August 2008.

On April 12, 2011, the court set the case for trial on September 6, 2011. On May 17, 2011, Warren, McDonald, Ottoboni, and Veit each filed and served a motion for summary judgment or, in the alternative, summary adjudication. The following day (May 18, 2011), the University and Father Locatelli filed and served their joint motion

15

for summary judgment or summary adjudication in the alternative. All five motions were scheduled for hearing on August 2, 2011.

On July 8, 2011, Serri made an ex parte application to continue both the hearing on the motions for summary judgment and the trial date for four weeks so she could complete additional discovery she needed to oppose the motions. After giving the Defendants an opportunity to file written opposition and holding a hearing on Serri's application, the court granted Serri's requests in part. The court continued the hearing on the motions for summary judgment from August 2, 2011, to August 25, 2011; extended the deadline for Serri to file opposition to the motions from July 19, 2011, to August 11, 2011; but denied Serri's request to continue the trial date.

On August 11, 2011, Serri filed her opposition to the motions for summary judgment, which consisted of a single memorandum of points and authorities, five separate statements (one in response to each of Defendants' five separate statements), the declarations of her counsel and of John Fox (an expert on AAP's), and 408 exhibits. Although Serri's evidence included excerpts from her deposition, she did not file a declaration in support of her opposition. Regarding the employment discrimination claims, Serri asserted that the stated reasons for her termination were false and that there was evidence of discriminatory animus.

On page one of her memorandum of points and authorities in opposition to the motions, Serri requested a further continuance of the summary judgment motions "to obtain the essential remaining discovery she needs to oppose [the] motions." Serri stated that she needed to depose Linda Campbell and a person most knowledgeable from the University, asserted that the University had refused to produce those witnesses, and argued that she could not "adequately oppose the motions without that discovery."

On August 19, 2011, Defendants filed papers in reply to Serri's opposition to the motions for summary judgment, including memoranda of points and authorities, separate statements in reply to Serri's opposition, and objections to Serri's evidence. Defendants

16

also opposed Serri's request for a second continuance, arguing that Serri had failed to comply with the procedural requirements of Code of Civil Procedure section 437c, subdivision (h),[7] since she had not submitted any affidavits or declarations supporting her continuance request and had not submitted any evidence that the Defendants had refused to produce any witnesses.

On August 23, 2011, two days before the hearing, Serri's counsel submitted additional points and authorities and a declaration supporting his second request for a continuance.

On August 24, 2011, the day before the hearing on the motions for summary judgment, Serri filed written responses to the Defendants' objections to her evidence. Later that day, the court issued a written tentative ruling sustaining Defendants' objections to Serri's evidence and granting each of the motions for summary judgment. Serri objected to the tentative ruling and requested oral argument.

On August 25, 2011, at the hearing on the motions for summary judgment, Serri filed an additional 37 pages of written objections to Defendants' evidence. She also filed a written statement of disqualification objecting to having Judge Mark Pierce hear the motions for summary judgment pursuant to section 170.3, on the grounds that he had failed to disclose that: (1) he was a graduate of the University, and (2) he had made financial contributions to the University. After conducting a hearing on Serri's disqualification request, the court denied it as untimely and then heard argument on the motions for summary judgment.

On August 30, 2011, the court issued its order on the motions for summary judgment. The court denied Serri's second request for a continuance to do additional discovery, overruled Serri's objections to Defendants' evidence, sustained Defendants' objections to Serri's evidence, and granted each of the motions for summary judgment.

_____

[7] All further unspecified statutory references are to the Code of Civil Procedure.

Although it sustained Defendants' objections to Serri's evidence, the court stated: "Regardless, after a comprehensive review of all of the evidence submitted by Plaintiff, the Court finds the even if it found Plaintiff's evidence to be admissible, it would not impact and/or change any of the rulings" on the motions for summary judgment.

On August 30, 2011, the court entered judgment in favor of Defendants, determined that Defendants were prevailing parties, and awarded Defendants their costs of suit. On September 2, 2011, the court issued a written order striking Serri's statement of disqualification.

On September 12, 2011, Serri filed a petition for writ of mandate in this court, in which she requested an order directing the trial court to vacate its order striking her statement of disqualification. That same day, Serri also filed a notice of motion for new trial. Defendants opposed the writ petition and the motion for new trial. Defendants also filed a memorandum of costs, which Serri challenged with a motion to tax. In November 2011, the trial court denied Serri's motion to tax, awarded Defendants $50,723.41 in pretrial costs, and denied Serri's new trial motion. Later, this court denied Serri's petition for writ of mandate.

## DISCUSSION

Serri challenges the order granting summary judgment on procedural grounds and on the merits. Procedurally, she argues that the court erred when it: (1) denied her section 170.3 motion to disqualify Judge Pierce; (2) denied her second motion for a continuance of the hearing on the summary judgment motions; and (3) sustained the defendants' objections to her evidence. On the merits, Serri challenges the summary adjudication of each of her causes of action and, thus, the orders granting summary judgment. We begin by addressing Serri's procedural challenges.

18

## I. The Court's Order on Serri's Statement of Disqualification is Not Appealable

At the start of the hearing on the motions for summary judgment, Serri filed a statement of disqualification (Statement) challenging Judge Pierce on the ground that "a person aware of the facts might reasonably entertain a doubt that Judge Pierce would be able to be impartial." (§ 170.1, subd. (a)(6)(A)(iii).) Such statements must "be presented at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification." (§ 170.3, subd. (c)(1).) In declarations, Serri and her counsel stated that *after* they received the court's tentative ruling on the motions for summary judgment, they did some Internet research and learned that Judge Pierce graduated from the University's law school in 1974, that he donated between $500 and $999 to the University between July 2002 and June 2003, and that "he lists his biography on the [University's] website."

Before hearing argument on the summary judgment motions, Judge Pierce placed both defense attorneys under oath. Ruby testified that Judge Pierce disclosed his relationship to the University during at least two case management conferences (CMC). Winner testified that, on two prior occasions, Judge Pierce had advised counsel that he had attended the University and that he had, "as a private attorney, filed a suit against [the] University." Serri's counsel, Samuel Kornhauser, disagreed; he said he attended every hearing and conference and Judge Pierce never disclosed any relationship to the University. Based on this evidence, Judge Pierce denied the Statement as untimely, then heard argument on the summary judgment motions.

On September 2, 2011, the court filed a written order striking the Statement as untimely, citing section 170.4.[8] The order contained a finding that Judge Pierce had

---

[8] Section 170.3, subdivision (c)(5) provides in part: "A judge who refuses to recuse himself or herself shall not pass upon his or her own disqualification or upon the sufficiency in law, fact, or otherwise, of the statement of disqualification filed by a party." Section 170.4, subdivision (b) contains an exception to this rule. It provides: "Notwithstanding paragraph (5) of subdivision (c) of Section 170.3, if a statement of

19

disclosed his connection to the University at a CMC on June 29, 2010. Attached to the order was a copy of the minute order from that CMC, in which the clerk noted that Judge Pierce had disclosed his relationship to the University and that the parties did not object. According to the minute order, Serri's counsel attended the June 29, 2010 CMC via telephone conference call.

As we have noted, on September 12, 2011, Serri filed a petition for writ of mandate in this court challenging the trial court's ruling on the Statement. We denied the writ petition. Contrary to Serri's assertion in her opening brief, our order denying the writ was not "without prejudice." "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal . . . ." (§ 170.3, subd. (d).) A statutory writ is the exclusive means of reviewing an order on a motion to disqualify a judge. (*People v. Freeman* (2010) 47 Cal.4th 993, 1000.) The summary denial of such a writ petition is a final decision on the merits. (*Fink v. Shemtov* (2010) 180 Cal.App.4th 1160, 1172-1173.) For these reasons, Serri's contentions regarding the disqualification motion are not cognizable in this appeal.

## II.  The Court Properly Denied Serri's Second Request for a Continuance

Serri contends the court erred when it denied her second request for a continuance of the summary judgment motions.

### A.  Procedural Background:  Discovery and Continuance Requests

Defendants began taking Serri's deposition on August 4, 2008. Due to "innumerable postponements" and delays, it took over two years to finish Serri's deposition, which was scheduled over nine separate dates and finally completed on

disqualification is untimely filed or if on its face it discloses no legal grounds for disqualification, the trial judge against whom it was filed may order it stricken."

20

December 3, 2010. In early 2009, Serri's counsel agreed that he would not schedule any of Defendants' depositions until after Serri's deposition was completed. The only discovery Serri undertook before the completion of her deposition was to serve form interrogatories on Defendants. On December 22, 2010, after her deposition was done, Serri served over 170 requests for production of documents on Defendants. In January 2011, Serri's counsel began, but did not complete, the depositions of Ottoboni, Veit, and Warren. In February 2011, Defendants produced over 3,000 documents in response to Serri's requests for production.

On June 1, 2011, two weeks after the summary judgment motions were filed, Serri's counsel noticed (1) McDonald's deposition; (2) the continued depositions of Warren, Ottoboni, and Veit; and (3) the depositions of two other University employees. On June 27, 2011, Serri's counsel noticed Ambelang's deposition. Despite scheduling difficulties and less than the statutorily required notice, all of these depositions were completed before July 6, 2011.

On July 6, 2011, Serri's counsel asked Defendants to stipulate to continue the hearing on the motions for summary judgment so he could complete additional discovery. At that time, no further depositions had been noticed and no discovery was pending. Defendants refused to stipulate to a continuance, so on July 8, 2011, Serri made an ex parte application to the court to continue both the hearing on the summary judgment motions and the trial date for four weeks. Serri's counsel declared that to properly prepare Serri's opposition to the motions for summary judgment, he needed additional discovery, including completing the depositions of Ottoboni and Veit and taking the depositions of eight other witnesses, including Linda Campbell. When the ex parte application was filed, none of those depositions had been noticed. Serri's counsel also stated that he needed time to file motions to compel Defendants' answers to deposition questions.

21

Rather than decide the continuance request on an ex parte basis, the court scheduled a hearing and issued an order that permitted Defendants to file opposition to Serri's application. Defendants opposed the continuance request, arguing that Serri did almost no discovery for nearly four years and did very little discovery after her deposition was completed, even after Defendants told the court in April 2011 that they planned to move for summary judgment. Defendants also argued that the declaration of Serri's counsel did not meet the statutory requirements for a continuance because it failed to show that "facts essential to justify opposition may exist but cannot, for reasons stated, then be presented" (§ 437c, subd. (h)).

At the hearing on the motion for a continuance, the court asked Serri's counsel why the depositions at issue had not been noticed in December 2010 and why Serri's discovery had not been completed.[9] Notwithstanding the court's questions and concerns about the discovery, it continued the hearing on the motions for summary judgment from August 2, 2011, to August 25, 2011, and extended the deadline for Serri to file opposition to the motions from July 19, 2011, to August 11, 2011.

On August 11, 2011, Serri filed her opposition to the motions for summary judgment. In the first paragraph of her memorandum of points and authorities, Serri requested a further continuance "to obtain the essential remaining discovery she need[ed] to oppose" the motions. She acknowledged that she had previously been granted a four-week extension of time to do discovery, but argued that Defendants had "refused to produce key witnesses (Linda Campbell and the Person Most Knowledgeable ('PMK'))" from the University. Serri's opposition did not include a declaration from her counsel supporting her second request for a continuance.

---

[9] At that point, more than four years had passed since Serri filed her complaint and almost three years had passed since Defendants had answered the fourth amended complaint.

22

In its reply, the University argued that Serri's second continuance request should be denied because it did not meet the requirements of section 437c, subdivision (h), "which requires a <u>declaration</u> identifying specific facts that [Serri] contends are essential to opposing the motion." The University also argued that Serri had "provided no evidence that Defendants have 'refused to produce' anyone" or shown good cause for a further continuance.

On August 23, 2011, two days before the hearing on the motions for summary judgment, Serri's counsel filed a supplemental declaration, which set forth his efforts to take Campbell's deposition, but did not contain any facts related to the deposition of the PMK from the University.[10] According to the supplemental declaration and exhibits attached thereto, Serri's counsel first served a notice for Campbell's deposition on July 11, 2011 (three days after he filed his first application for a continuance). The deposition was set for July 22, 2011. Campbell, who was on family medical leave to care for her sick husband, was not available on July 22, 2011. The parties thereafter attempted to schedule her deposition for different dates in August 2011, but some of the dates did not work because of Campbell's schedule (her husband had surgery on one of the dates) and because Serri's counsel was on vacation for two weeks. On July 29, 2011, Serri sought assistance from the court on an ex parte basis to compel Campbell's deposition. The court ordered the University's counsel to do his best to produce Campbell; the order

---

[10] Serri asked the University to produce the PMK to testify regarding 10 different topics. When the University objected to the scope of the deposition notice, Serri sought an ex parte order from the court compelling the deposition of the person or persons most knowledgeable and an order shortening time for taking the deposition(s). The court granted partial relief and ordered the University to produce the persons most knowledgeable regarding three of the 10 topics identified in Serri's deposition notice. The court held that the depositions need not take place on August 2, 2011, as noticed. The day before the hearing on the motions for summary judgment, Serri took the depositions of two persons the University had identified as PMK's on the topics ordered by the court.

23

stated that the court was "not ordering [] Campbell to appear if the circumstances underlying her leave make it unreasonable to do so."

At the hearing on the motions for summary judgment, Serri did not mention her request for a continuance. The court denied Serri's request for a further continuance because she failed "to submit a declaration indicating that facts essential to her opposition exist and could be established through additional discovery."

## B. Legal Principles Governing Continuances and Standard of Review

Generally, the power to determine whether a continuance should be granted is within the discretion of the court, and there is no right to a continuance as a matter of law. (*Mahoney v. Southland Mental Health Associates Medical Group* (1990) 223 Cal.App.3d 167, 170 (*Mahoney*).) " '[T]here is no policy in this state of indulgence or liberality in favor of parties seeking continuances' " (*Id.* at pp. 171, 172.)

Section 437c, subdivision (h) creates an exception to the general rule. (*Mahoney*, *supra*, 223 Cal.App.3d at p. 170.) It provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just. The application to continue the motion to obtain necessary discovery may also be made by ex parte motion at any time on or before the date the opposition response to the motion is due." (§ 437c, subd. (h).) Section 437c, subdivision (h) mandates a continuance of the hearing on a motion for summary " ' " 'upon a good faith showing by *affidavit* that a continuance is needed to obtain facts essential to justify opposition to the motion.' " ' " (*Mahoney*, at p. 170, original italics.)

The plaintiff in *Mahoney* did not file any opposition to the defendants' motion for summary judgment. After the time for filing opposition had passed, she requested and

received a two-week continuance from the defendants.  She subsequently made a second, oral request for a continuance at the time set for the continued hearing on the motion without submitting a written declaration.  (*Mahoney*, *supra*, 223 Cal.App.3d at p. 172.)  The appellate court affirmed the trial court's order denying the second request for a continuance.  The court held that although a trial court may excuse the failure to comply with the requirement of a declaration in support of a motion for continuance, it is not required to do so.  (*Ibid.*)

Where the party opposing the motion fails to make the factual showing required by section 437c, subdivision (h), a continuance is not mandatory.  (*Lerma v. County of Orange* (2004) 120 Cal.App.4th 709, 716 (*Lerma*).)  In such cases, "the court must determine whether the party requesting the continuance has nonetheless established good cause therefor.  That determination is within the court's discretion."  (*Id.* at p. 716.)

## C.  Analysis

Serri made her second request for a continuance in her points and authorities in opposition to the motion, but neglected to file an affidavit or declaration supporting the request on or before the date her opposition was due, as required by section 437c, subdivision (h).  Although the trial court had the power to excuse Serri's failure to file a timely declaration, it was not required to do so, and whether to grant the request was within the court's discretion.  (*Mahoney*, *supra*, 223 Cal.App.3d at p. 172; *Lerma*, *supra*, 120 Cal.App.4th at p. 716.)

Serri argues that she was not required to support her second continuance request with a new declaration and that she was entitled to rely on the declaration her counsel filed in support of her first continuance request, which stated that Campbell needed to be deposed "to rebut her claims as to potential harm to [the University] regarding federal contracts due to the alleged lack of an Affirmative Action Plan."

25

" 'The nonmoving party seeking a continuance "must show: (1) the facts to be obtained are essential to opposing the motion; (2) there is reason to believe such facts may exist; and (3) the reasons why additional time is needed to obtain these facts. [Citations.]" [Citation.]' Generally speaking, the party seeking the continuance must 'provide supporting affidavits or declarations detailing facts that would establish the existence of controverting evidence . . . .' " (*Lerma*, *supra*, 120 Cal.App.4th at p. 715.) The declarations in *Lerma* were "non-specific." (*Ibid.*) "The only thing before the court was the attorney's bald assertion that facts essential to justify opposition may have existed, but there was no clear statement as to what those facts may have been. [S]ection 437c, subdivision (h) requires more than a simple recital that 'facts essential to justify opposition may exist.' The . . . declaration in support of the continuance request must detail the specific facts that would show the existence of controverting evidence." (*Ibid.*) "There is good reason for this more exacting requirement. The statute cannot be employed as a device to get an automatic continuance by every unprepared party who simply files a declaration stating that unspecified essential facts may exist. The party seeking the continuance must justify the need, by detailing both the particular essential facts that may exist and the specific reasons why they cannot then be presented." (*Id.* at pp. 715-716.)

In our view, counsel's original declaration was insufficient to meet the requirements of section 437c, subdivision (h), as explained in *Lerma*. The declaration did not set forth the particular facts that may exist or explain why additional time was needed to obtain those facts. Facts relating to the parties efforts to schedule Campbell's deposition, her limited availability due to her husband's illness, and the court's order on Serri's request to compel Campbell's deposition were all relevant to the question whether the motion should be continued to obtain her deposition. None of that information was in counsel's original declaration.

Serri's reliance on *Taylor v. Bell* (1971) 21 Cal.App.3d 1002, 1008, *Larson v. Solbakken* (1963) 221 Cal.App.2d 410, 430, and *Friedman v. Knecht* (1967) 248 Cal.App.2d 455, 460 is unavailing. Those cases involved the continuance of a trial to allow a party to present evidence; none of them involved the continuance of a summary judgment motion or section 437c, subdivision (h).

Lack of diligence is a factor the court may consider when exercising its discretion to continue the hearing on a motion for summary judgment. (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 102; see also *Cooksey v. Alexakis* (2004) 123 Cal.App.4th 246, 255-257.) The only discovery Serri did before her deposition was completed was to propound a set of form interrogatories. Although the parties agreed that Serri would not take any of Defendants' depositions until after her deposition was completed, nothing prevented her from propounding other forms of discovery. Serri waited until after her deposition was completed to propound requests for production of documents, and she took a few depositions in January 2011. Although Serri obtained most of Defendants' documents in February 2011, she did not notice any other depositions until June 2011, two weeks *after* she was served with the summary judgment motions. Further, Serri had already obtained one continuance to conduct discovery.

Serri said she needed to depose 10 people when she made her first continuance request, but she abandoned efforts to depose five of those individuals. Furthermore, although the PMK depositions were not completed until the day before the hearing on the summary judgment motions, Serri does not contend that those depositions yielded facts that established the existence of additional controverting evidence. In addition, the University offered to make Campbell available on more than one occasion and the court issued an order that Campbell was not required to appear if the circumstances underlying her leave made it unreasonable to do so. Moreover, while Serri asserts that she needed Campbell's testimony to establish that the University did not lose any grants as a result of the missing AAP's, that fact was not contested by the University. Under these

27

circumstances, the court did not abuse its discretion when it denied Serri's second request to continue the hearing on the summary judgment motions.

### III.  *Defendants' Objections to Serri's Evidence*

Serri contends the trial court abused its discretion when it sustained all of Defendants' objections to the evidence she submitted in opposition to the motions for summary judgment.  Acknowledging the court's statements that it conducted "a comprehensive review" of all of her evidence, and even if it had found her "evidence to be admissible, it would not impact and/or change any of the rulings," Serri argues that the court committed reversible error when it sustained Defendants' objections to her evidence.

#### A.  Background

Serri's evidence in opposition to the motions for summary judgment consisted of the declarations of her counsel, Samuel Kornhauser, and an expert witness, John Fox. Kornhauser attached 408 exhibits to his declaration, which consume 1374 pages of the record on appeal.

Both the University and the Individual Defendants filed written objections to Serri's evidence.  The University's objections were 22 pages long; it made 124 objections to 116 of Serri's exhibits and 48 objections to statements in Fox's declaration.  The Individual Defendants' objections were 40 pages long; they made 214 objections to almost every one of Serri's exhibits.  They also objected to Fox's declaration.

Serri filed a 47-page response to the University's objections.  The record contains a similar 63-page document that appears to be a template for responding to the Individual

Defendants' objections, but the column entitled "Reasons Why Defendants' Objections are Without Merit" in that document is blank.[11]

One of Defendants' objections was that Serri's evidence included "nearly 200 exhibit tabs for which no exhibits were submitted." In other words, although there were tabs for 408 exhibits, almost half of those tabs did not contain any evidence. The Individual Defendants identified those exhibits by number and also objected to a subset of those exhibits that Serri cited to in her opposition papers. For example, Serri cited exhibits 21, 271, 272, 352, and 378 in her points and authorities, even though no evidence was submitted under those exhibit tabs. At the hearing, Serri's counsel explained that the 408 exhibits were from his trial book and that he told his secretary to take out the exhibits that he was not using to oppose the summary judgment motion, but his secretary forgot to remove the exhibit tabs.

The University objected to a number of Serri's exhibits on the grounds of relevance, arguing that while they were in the 1374 pages of material Serri submitted, they were not cited anywhere in Serri's opposition papers. Defendants objected that many of the exhibits lacked foundation because they were not properly authenticated, that

---

[11] Since Serri did not respond to the Individual Defendants' objections to her evidence below, they contend that she has waived any challenge to the court's evidentiary rulings. We disagree. A party that objects to evidence presented on a motion for summary judgment must either timely file separate written objections or object orally at the hearing. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 531-532 (*Reid*), citing § 437c, subds. (a), (b)(1)-(4) and Cal. Rules of Court, rules 3.1352, 3.1354(a).) "Evidentiary objections not made at the hearing shall be deemed waived." (§ 437c, subd. (b)(5).) But neither section 437c nor the Rules of Court require a party to file written opposition to the opposing party's objections or risk waiver. (See *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 526 [no authority suggests that responses to the objections must be made in the trial court to preserve a challenge to the trial court's rulings on appeal].) Each of the parties objected to the opposing side's evidence, thereby avoiding waiver as to the evidence to which they objected.

many were inadmissible hearsay, and others were irrelevant because they did not support the proposition for which they were cited.

In accordance with California Rules of Court, rule 3.1354(c), Defendants filed 71 pages of proposed orders on their objections. Rather than use the proposed orders, the court ruled on the objections in its order granting summary judgment. The court sustained all of Defendants' objections, stating: "Although Plaintiff's evidence contains over 400 exhibit tabs, nearly 200 exhibit tabs fail to contain any exhibits and many of the other exhibits lack foundation, are inadmissible hearsay, and/or are irrelevant as they are not cited in Plaintiff's opposition. With regard to the declaration of John Fox, Esq., many of the statements contained therein are not factually supported and constitute improper expert and/or legal opinion. Regardless, after a comprehensive review of all the evidence submitted by Plaintiff, the Court finds that even if it found Plaintiff's evidence to be admissible, it would not impact and/or change any of the rulings discussed below."

## B. Standard of Review

According to the weight of authority, appellate courts "review the trial court's evidentiary rulings on summary judgment for abuse of discretion. [Citations.] As the part[y] challenging the court's decision, it is [Serri's] burden to establish such an abuse, which we will find only if the trial court's order exceeds the bounds of reason." (*DiCola v. White Brothers Performance Products, Inc*. (2008) 158 Cal.App.4th 666, 679 (*DiCola*); but see *Reid*, *supra*, 50 Cal.4th 512, 535 [Supreme Court noted issue but concluded that it need "not decide generally whether a trial court's ruling on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo"] and *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255, fn.4 (*Nazir*) [observing that the standard of review is unsettled and assuming, without deciding, that the abuse of discretion standard applies].)

30

This court has stated:  "In determining whether a triable issue was raised or dispelled, we must disregard any evidence to which a sound objection was made in the trial court, but must consider any evidence to which no objection, or an unsound objection, was made.  (See *Reid . . .* , *supra*, 50 Cal.4th 512, 534; . . . § 437c, subds. (b)(5), (c), (d).)  Such evidentiary questions, however, are subject to the overarching principle that the proponent's submissions are scrutinized strictly, while the opponent's are viewed liberally."  (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 957.)

## C.  Objections to Serri's Documentary Exhibits

Citing *Nazir*, Serri argues that the trial court's "blanket and baseless grant" of all of Defendants' evidentiary objections was an abuse of discretion.

The plaintiff in *Nazir*, who was of Pakistani ancestry, sued his employer (United Airlines) and a supervisor for discrimination, retaliation, harassment, and other claims after he was terminated from his employment.  (*Nazir*, *supra*, 178 Cal.App.4th at pp. 248-249.)  The defendants moved for summary judgment; their reply papers included 764 objections to the plaintiff's evidence, set forth in 324 pages.  (*Id.* at pp. 249, 254.)  The trial court overruled one and sustained 763 of the objections.  (*Id.* at p. 255.)  On appeal, the plaintiff acknowledged that some of the objections could have been properly sustained, but argued that the order sustaining all but one of the objections was error.  The appellate court agreed and held that the trial court abused its discretion by making a blanket ruling sustaining all but one of the defendants' objections.  (*Id*. at p. 254.)

The court stated that "a trial court presented with timely evidentiary objections in proper form must expressly rule on the individual objections."[12]  (*Nazir*, *supra*, 178

---

[12]  The court also stated that if the trial court does not rule on the objections, "the objections are deemed waived and the objected-to evidence included in the record."  (*Nazir*, 178 Cal.App.4th at p. 255, citing *Demps v. San Francisco Housing Authority*

Cal.App.4th at p. 255.)  Although the trial court had " 'ruled,' however conclusorily, that all objections save one were sustained," the appellate court held that the trial court's blanket ruling was "hardly a ruling, as it could not provide any meaningful basis for review." (*Id.* at p. 255.)  The court assumed, without deciding, that the abuse of discretion standard applied, and stated, "[W]e have no hesitancy in holding that the sustaining of all but one of defendants' 764 objections was an abuse of discretion.  Put otherwise, there is no way that the trial court could properly have sustained 763 objections ' " 'guided and controlled . . . by fixed legal principles.' " ' [Citation.]" (*Ibid.*)

The *Nazir* court also reviewed the objections and concluded that most were either unsupported by any rule or were patently frivolous.  (*Nazir*, *supra*, 178 Cal.App.4th at pp. 255-257.)  The court observed that (1) some of the "objections did not even assert any basis for the objection"; (2) some of the "objections were to [the] plaintiff's testimony about his dates of employment, his religion, his skin color, and his national origin"; (3) "[o]ver 250 of the sustained objections failed to quote the evidence objected to, in violation of California Rules of Court, rule 3.1354"; (4) 27 of the objections "were to [the] plaintiff's brief, not his evidence"; and (5) "many of the objections were frivolous." The court held that all of the plaintiff's admissible evidence was properly before it and that the admissible evidence created triable issues of fact precluding summary judgment. (*Id*. at pp. 256, 257, 264; accord *Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1447-1449 (*Palms*) [blanket ruling summarily sustaining all of the

_____

(2007) 149 Cal.App.4th 564, 578.)  However, *Nazir* was decided before *Reid*.  In *Reid*, the Supreme Court addressed the effect of a trial court's failure to rule on evidentiary objections in a motion for summary judgment and held, "If the trial court fails to rule after a party has properly objected, the evidentiary objections are not deemed waived on appeal." (*Reid*, *supra*, 50 Cal.4th at p. 517.)  Instead, "it is presumed that the objections have been overruled, the trial court considered the evidence in ruling on the merits of the summary judgment motion, and the objections are preserved on appeal." (*Id.* at p. 534.) Thus, in applying *Nazir*, we reject the "deemed waived" aspect of its holding.

32

plaintiff's 39 objections to the defendant's evidence, without reasoning, was an abuse of discretion].)

Serri's brief provides little help in addressing the propriety of the trial court's ruling on Defendants' objections to Serri's evidence. Unlike *Nazir*, Serri does not provide any examples of specific objections that the trial court sustained that were erroneous or unreasonable. After citing *Nazir*, Serri asserts, "[m]oreover, as pointed out in Plaintiff's [47-page] written responses to Defendants' evidentiary objections . . . , Defendants' objections were without merit and it was erroneous to sustain them." It is inappropriate for an appellate brief to incorporate by reference arguments contained in a document filed in the trial court. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 294, fn. 20 (*Soukup*).) Such practice does not comply with the requirement that an appellate brief "support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).) We shall therefore disregard Serri's effort to incorporate by reference arguments she made below in response to Defendants' objections to her evidence. (*Soukup*, at p. 294, fn. 20.)

The only other argument Serri makes regarding her documentary evidence is the contention that the court erred when it sustained Defendants' objections that her evidence lacked foundation. Serri does not, however, discuss this point in the context of any specific exhibit or exhibits. Serri argues that almost all of her exhibits were produced by Defendants in response to her document requests and that "by producing their documents in discovery, [Defendants] have <u>admitted</u> their genuineness." The legal authority Serri cites, however, neither supports nor addresses her contention.[13]

---

[13] Evidence Code section 1220 governs party admissions as an exception to the hearsay rule and *People v. Richards* (1976) 17 Cal.3d 614, 617-618 (disapproved on another ground as stated in *People v. Carbajal* (1995) 10 Cal.4th 1114, 1126) discusses the admissibility of statements under the party declarant and adopted admission exceptions to the hearsay rule.

The Individual Defendants concede that many of Serri's documents bear Bates-stamp numbers indicating they were produced by Defendants. They contend, however, that dozens of exhibits consist of hand-written notes by unidentified authors and other items that require additional authentication. They argue, "Not every document that comes out of an opposing party's files is automatically admissible against even that party, much less as to all others," and that more is required to establish admissibility. We agree.

Documents obtained in discovery in response to a request for production of documents may be used to support or oppose a motion for summary judgment, but must be presented in admissible form. This means the evidence must be (1) properly identified and authenticated, (2) admissible under the secondary evidence rule, (3) nonhearsay or admissible under some exception to the hearsay rule, and (4) a complete record, not selected portions of the document. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2013) ¶¶ 10:168-10:169, pp. 10-70 to 10-71.) Unless the opposing party admits the genuineness of the document, the proponent of the evidence must present declarations or other "evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is." (Evid. Code, § 1400; see Evidence Code, §§ 1410 et seq. for methods of authenticating documents.)

Serri's only effort to authenticate her exhibits was Kornhauser's declaration that the "exhibits attached hereto are true and correct copies of the originals or excerpts of the originals or copies of documents produced by Defendants in this action or excerpts of the originals of depositions or transcripts of investigations in this case." Since the Individual Defendants have briefed the issue, we shall address the propriety of the trial court's order sustaining Defendants' objections to the handwritten notes.

Serri's evidence includes more than 20 exhibits that consist of handwritten notes (see e.g., Exhibits 38, 43, 68, 75, 76). According to Serri, these are McDonald's notes. However, none of the handwritten notes are signed and there is no evidence they were written by McDonald. To authenticate the notes, Serri could have propounded requests

34

for admission asking McDonald to admit their authenticity and to admit that she wrote them (§ 2033.010). Serri could also have asked McDonald to authenticate the notes when she took McDonald's deposition. There is no evidence in the record that she did either of these things. Furthermore, Defendants did not rely on the notes in their own submission. (*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1526-1529 [trial court erred in sustaining authentication, foundation, and other objections to deposition excerpts in the plaintiff's evidence where the moving parties relied on the same depositions].) In addition, many of the notes, to the extent we can decipher them, appear to document conversations with other persons and are therefore hearsay. Since Serri did not meet her burden of demonstrating the admissibility of the handwritten notes, the trial court did not err in sustaining objections to them.

As for the remainder of Serri's documentary exhibits, this case is distinguishable from *Nazir* since Defendants' objections do not suffer from the same defects as those in *Nazir*. Serri fails to cite examples of objections that were frivolous and many objections are supported by rules of evidence. On the other hand, our review of the record discloses a problem with the trial court's ruling: some of the exhibits Defendants objected to were identical to documents Defendants had submitted in support of their motions for summary judgment (compare Serri's Exhibits 66, 124, 181 and Individual Defendants' Exhibits L, R, and BB). The Individual Defendants objected to these exhibits on authentication, foundation, hearsay, and relevance grounds; the University objected that one was hearsay and another was irrelevant. Since Defendants had relied on this very same evidence, there was no merit to these objections and they should not have been sustained.

We also look to *Reid* for guidance. The defendant employer in *Reid* had raised more than 175 separate objections to the plaintiff employee's evidence opposing summary judgment. (*Reid*, *supra*, 50 Cal.4th at p. 533.) Rather than rule on the objections, the trial court made what was known as a *Biljac* ruling and stated, " 'The

Court declines to render formal rulings on evidentiary objections. In ruling, the Court relied on competent and admissible evidence pursuant to *Biljac Associates v. First Interstate Bank* [(1990)] 218 Cal.App.3d 1410, 1419-1429 [*Biljac*].' " (*Reid*, at p. 533.) The *Reid* court disapproved of *Biljac* "to the extent it permits the trial court to avoid ruling on specific evidentiary objections." (*Reid*, at p. 532 & fn. 8.) The court held that the "trial court must rule expressly on those objections. [Citation.] If the trial court fails to rule, the objections are preserved on appeal." (*Id.* at p. 532, citing *Vineyard Springs Estates v. Superior Court* (2004) 120 Cal.App.4th, 633, 642-643 [trial courts have a duty to rule on evidentiary objections presented in proper form].)

The Supreme Court "recognize[d] that it has become common practice for litigants to flood the trial courts with inconsequential written evidentiary objections, without focusing on those that are critical. Trial courts are often faced with 'innumerable objections commonly thrown up by the parties as part of the all-out artillery exchange that summary judgment has become.' [Citation.] Indeed, the *Biljac* procedure itself was designed to ease the extreme burden on trial courts when all 'too often' 'litigants file blunderbuss objections to virtually every item of evidence submitted.' [Citations.] To counter that disturbing trend, [the Supreme Court] encourage[d] parties to raise only meritorious objections to items of evidence that are legitimately in dispute and pertinent to the disposition of the summary judgment motion. In other words, litigants should focus on the objections that really count. Otherwise, they may face informal reprimands or formal sanctions for engaging in abusive practices. At the very least, at the summary judgment hearing, the parties—*with the trial court's encouragement*—should specify the evidentiary objections they consider important, so that the court can focus its rulings on evidentiary matters that are critical in resolving the summary judgment motion." (*Reid*, *supra*, 50 Cal.4th at pp. 532-533; italics added.)

As we have noted, another issue in *Reid* was the effect of the trial court's *Biljac* ruling and whether it resulted in a waiver of the objections and, if not, whether the

36

objections should be deemed to have been sustained or overruled. (*Reid*, at pp. 533-535.) The court held that "if the trial court fails to rule expressly on specific evidentiary objections, it is presumed that the objections have been overruled, the trial court considered the evidence in ruling on the merits of the summary judgment motion, and the objections are preserved on appeal." (*Id.* at p. 534.)

The trial court's ruling here is different from the *Biljac* ruling that was disapproved of in *Reid*, but is equally problematic. The trial court in *Reid* declined to rule on the evidentiary objections, but stated that it was relying only "on competent and admissible evidence." (*Reid*, *supra*, 50 Cal.4th at p. 533.) In this case, the court ruled on the objections—its blanket ruling sustained all of the objections and observed that many of the exhibits lacked foundation, were inadmissible hearsay, or were irrelevant because they were not cited in Serri's opposition. This blanket ruling was "hardly a ruling," provided no meaningful basis for review, and could be treated as a failure to rule. (*Nazir*, *supra*, 178 Cal.App.4th at p. 255.) The ruling was similar to trial court rulings under the *Biljac* procedure that was disapproved of in *Reid* since the result in both situations is a failure to rule on the objections.

After the court sustained all of Defendants' objections, it stated that even if Serri's evidence was admissible, it would not impact or change any of the court's rulings. This statement does not provide any more guidance than a *Biljac* ruling. Defendants objected to all but 13 of Serri's 408 exhibits. Under the trial court's ruling, then, either most of Serri's evidence was excluded or all of it was admitted.

Given the number of objections and the fact that some were sustained in error, we follow *Nazir* and hold that the trial court abused its discretion by issuing a blanket ruling on Defendants' objections.[14] (*Nazir*, *supra*, 178 Cal.App.4th at p. 255, italics added.)

---

[14] We are not unsympathetic to the plight of the trial judge faced with hundreds of blunderbuss objections. As the court counseled in *Reid*, the litigants should focus their objections on the items of evidence that are legitimately in dispute. And at the hearing on

37

Finally, "[i]n regard to whether the evidentiary ruling was harmless, an erroneous evidentiary ruling requires reversal only if 'there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error. [Citation.]' " (*Palms*, *supra*, 210 Cal.App.4th at p. 1449; see Evid. Code, § 354.) In this case, the court's error in issuing a blanket evidentiary ruling does not change the outcome of the motions because Serri's admissible evidence does not create a triable issue of material fact.

We have already addressed Defendants' objections to the handwritten notes and held that the court properly sustained them. Rather than discuss any other exhibits here, we will discuss the admissibility of other evidence that Serri relies on in the balance of this opinion as it relates to the substanive issues she raises on appeal.

### D. Objections to John Fox's Declaration

On appeal, Serri relies on the portion of Fox's declaration in which he opines that the University would not suffer any adverse consequences as a result of not having an AAP. Without deciding whether the trial court erred when it sustained Defendants' objections to this portion of Fox's declaration, we shall assume this portion of the declaration is admissible and will consider it in our review on appeal.

### IV. *The Court Properly Granted Summary Judgment*

We begin by summarizing the legal principles that govern motions for summary adjudication and summary judgment in general. We then discuss rules that are unique to summary adjudication and summary judgment in employment cases.

---

the motion, the trial court should encourage the parties to "specify the evidentiary objections they consider important, so that the court can focus its rulings on evidentiary matters that are critical in resolving the summary judgment motion." (*Reid*, *supra*, 50 Cal.4th at pp. 532-533.)

**A. Standard of Review**

We review an order granting summary judgment de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) The trial court's ruling on a motion for summary adjudication, like that on a motion for summary judgment, is subject to this court's independent review. (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.) In determining whether summary judgment was proper, we analyze the propriety of granting summary adjudication with regard to each of Serri's causes of action.

In undertaking our independent review, we apply the same three-step analysis used by the trial court. First, we identify the issues framed by the pleadings. Second, we determine whether the moving party has established facts justifying judgment in its favor. Finally, in most cases, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable issue of material fact. (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 886-887.)

In performing our review, we view the evidence in a light favorable to the losing party (Serri), liberally construing her evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768-769.)

**B. General Rules Regarding Summary Judgment and Summary Adjudication**

"A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (§ 437c, subd. (f)(1).) The statute thus authorizes motions for summary adjudication that "reduce the costs and length of litigation" by limiting the substantive

areas of dispute. (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1852; see also, *Catalano v. Superior Court* (2000) 82 Cal.App.4th 91, 97.)

Summary judgment motions serve a similar purpose, namely "to identify those cases in which there is no factual issue which warrants the time and cost of factfinding by trial." (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 (*Martin*).) Thus, the object of both procedures is "to cut through the parties' pleadings" to determine whether trial is necessary to resolve their dispute. (*Aguilar*, *supra*, 25 Cal.4th at p. 843.)

Summary adjudication motions are "procedurally identical" to summary judgment motions. (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1290.) A summary judgment motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).) To be entitled to judgment as a matter of law, the moving party must show by admissible evidence that the "action has no merit or that there is no defense" thereto. (*Id.*, subd. (a).) A defendant moving for summary judgment meets this burden by presenting evidence demonstrating that one or more elements of the cause of action cannot be established or that there is a complete defense to the action. (*Id.*, subds. (o), (p)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 849-850, 853-854.) Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to that cause of action or defense. (§ 437c, subd. (p)(2); see *Aguilar*, at p. 850.) Material facts are those that relate to the issues in the case as framed by the pleadings. (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 67.) There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. (*Aguilar*, *supra*, 25 Cal.4th at p. 845.)

40

## C. Summary Judgment/Summary Adjudication in Employment Cases

Both federal and state laws prohibit employers from discriminating against employees on the basis of race, sex, or ethnic origin. (Gov. Code, §§ 12940, subd. (a), 12941, subd. (a); 42 U.S.C. § 2000e et seq. [Title VII of the Civil Rights Act of 1964].)

In cases alleging employment discrimination, we analyze the trial court's decision on a motion for summary judgment using a three-step process that is based on the burden-shifting test that was established by the United States Supreme Court for trials of employment discrimination claims in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792. (See, e.g., *Guz, supra*, 24 Cal.4th at pp. 354-355; *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 111 (*Reeves*).) This test "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra*, 24 Cal.4th at p. 354.)

At trial, under the first step of the *McDonnell Douglas* framework, the plaintiff may raise a presumption of discrimination by presenting a "prima facie case," the components of which vary depending upon the nature of the claim, but typically require evidence that " '(1) [the plaintiff] was a member of a protected class, (2) [the plaintiff] was qualified for the position he [or she] sought or was performing competently in the position . . . held, (3) [the plaintiff] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance [that] suggests discriminatory motive.' " (*Reeves, supra*, 121 Cal.App.4th at p. 112.) "A satisfactory showing to this effect gives rise to a presumption of discrimination which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff." (*Ibid.*, citing *Guz, supra*, at pp. 355-356.) However, under the second step of the test, "the employer may dispel the presumption merely by articulating a legitimate,

41

nondiscriminatory reason for the challenged action. [Citation.] At that point the presumption disappears." (*Ibid.*) Under the third step of the test, the "plaintiff must . . . have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." (*Guz*, *supra*, at p 356.)

The *McDonald-Douglas* framework is modified in the summary judgment context. In a summary judgment motion in "an employment discrimination case, the employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors." (*Hicks v. KNTV Television, Inc*. (2008) 160 Cal.App.4th 994, 1003, citing *Guz*, *supra*, 24 Cal.4th at p. 357.) Defendants here presented evidence that Serri was terminated for legitimate reasons that were "unrelated to unlawful discrimination." (*Hicks*, at p. 1003.)

"[I]f nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus, 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding of *discrimination*." (*Guz*, *supra*, 24 Cal.4th at p. 358; original italics.) Examples of legitimate reasons are a failure to meet performance standards (*Trop v. Sony Pictures Entertainment Inc*. (2005) 129 Cal.App.4th 1133, 1149) or a loss of confidence in an employee (*Arteaga v. Brink's, Inc*. (2008) 163 Cal.App.4th 327, 352).

If the employer meets its initial burden, the burden shifts to the employee to "demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in

42

intentional discrimination or other unlawful action." (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038 (*Cucuzza*).)

In *Guz*, the Supreme Court emphasized that "the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz*, *supra*, 24 Cal.4th at p. 361, fn. omitted.) It is not sufficient for an employee to make a bare prima facie showing or to simply deny the credibility of the employer's witnesses or to speculate as to discriminatory motive. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004 (*Hersant*); *Wallis v. J.R. Simplot Co.* (1994) 26 F.3d 885, 890; *Compton v. City of Santee* (1993) 12 Cal.App.4th 591, 595-596.) Rather it is incumbent upon the employee to produce "substantial responsive evidence" demonstrating the existence of a material triable controversy as to pretext or discriminatory animus on the part of the employer. (*University of Southern California v. Superior Court* (1990) 222 Cal.App.3d 1028, 1039; *Martin,* 29 Cal.App.4th at p. 1735.)

### D. First and Second Causes of Action: The Trial Court Properly Granted Summary Adjudication of Serri's Employment Discrimination and Tortious Discharge Claims

The trial court granted the University's motions for summary adjudication of Serri's causes of action for employment discrimination, tortious discharge, and retaliation in violation of the FEHA, finding that the University had presented sufficient evidence that Serri's termination was based upon legitimate, nondiscriminatory factors and that she was terminated for failing to competently perform her job duties. The court also found that Serri failed to produce substantial evidence that the University's reasons were untrue or pretextual or that the University acted with a discriminatory animus.

On appeal, Serri argues that the trial court erred because it failed to consider all of the evidence and it improperly weighed conflicting evidence. In particular, Serri contends the court failed to consider evidence that the University prevented her from doing her job by refusing to: (1) hire a consultant to help her prepare the AAP, (2) provide the data she needed to complete the AAP's, (3) train her assistant, Linda Jocewicz, to use certain computer software so she could retrieve the pertinent data herself, and (4) allow Serri to attend seminars to update her skills. Serri also contends the court failed to consider that preparation of the AAP's was a minor part of her job.

The University contends Serri was terminated for legitimate, nondiscriminatory business reasons, namely that she (1) "failed to prepare, develop and implement" the University's AAP for three years; (2) failed to disclose the nonexistence of those AAP's to her supervisors; and (3) made "misrepresentations" related to the AAP's. These are legitimate, nondiscriminatory reasons to explain Serri's termination and are sufficient to shift to Serri the burden of showing a triable issue of their falsity and ultimately of discriminatory motive instead. (*Kelly v. Stamps.com Inc*. (2005) 135 Cal.App.4th 1088, 1098.) Our analysis will therefore focus on the question whether Serri satisfied her burden.

"[E]vidence that the employer's claimed reason [for the employee's termination] is *false*—such as that it conflicts with other evidence, or appears to have been contrived after the fact—will tend to suggest that the employer seeks to conceal the real reason for its actions, and this in turn may support an inference that the real reason was unlawful." (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 715; original italics.) " 'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [Citations.] Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate

reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [the asserted] non-discriminatory reasons." ' " (*Hersant*, *supra*, 57 Cal.App.4th at p. 1005; original italics.) "Logically, disbelief of an Employer's stated reason for a termination gives rise to a compelling inference that the Employer had a different, unstated motivation, but it does not, without more, reasonably give rise to an inference that the motivation was a prohibited one." (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1531-1532 (*McGrory*).)

Serri attempts to demonstrate falsity and pretext by arguing that there was a disputed factual issue on the question whether preparation of the AAP's was the most important part of her job. Indeed, Defendants relied on evidence, all of which was authored by Serri, that the preparation of the AAP was one of her primary job duties. The job description Serri prepared for McDonald in June 2006 stated more than once that "develop[ing] and implement[ing] the annual affirmative action program for the University" was one of her duties. The personal evaluation she prepared for Father Locatelli in July 2004 discussed her work on the AAP. Her November 2005 letter to Father Locatelli, in which she complained about her salary, listed supervising the preparation of the "federally mandated annual" AAP as one of her job duties and described the AAP as "pivotal and essential for us for obtaining and retaining federal grants." In deposition, Serri confirmed that these statements were true. And in her e-mail to McDonald, protesting the decision to have McDonald take over responsibility for the 2006 AAP, Serri described preparation of the AAP as "one of the roles that define my position."

Serri now disputes that preparation of the AAP's was "the most important part of her job." She cites to Hirsch's testimony that preparation of the AAP took only 15 to 20 hours of her time since she was authorized to use a consultant. But whether it was the most important part of Serri's job is not material or at issue. Evidence presented by both

45

sides supports the conclusion that Serri's duties included preparing the AAP and that she failed to prepare the narrative portion of the AAP (the part that she had previously prepared personally) for three years.

In support of her contention that the University's reasons for terminating her were untrue or pretextual, Serri attempts to contradict her own deposition testimony that after the University became a federal contractor it was "obligated to create the [AAP]." Citing Fox's declaration, she argues that she opined "incorrectly" that the University had to have an AAP. On appeal, she contends she was not an expert in AAP compliance and that the trial court ignored Fox's declaration that the failure to have an AAP for three years would result in "no sanctions, fines or adverse consequences" to the University.

This argument contradicts some of Serri's documentary evidence (documents authored by Serri in which she stated that the University was required to have an AAP) as well as her own deposition testimony. We also note that other portions of Serri's brief (her statement of facts) state that federal contactors like the University are required "to have an AAP in place and update it annually." Fox declared that in his opinion, "no sanctions, fines or adverse consequences will OR CAN ensue against a federal contractor which . . . agrees to provide OFCCP [(the Office of Federal Contract Compliance Programs)] with a delinquent AAP." This does not create a triable issue on the question whether the University was required to have an AAP. Indeed, the University does not dispute that it suffered no adverse consequences as a result of Serri's failure to prepare the AAP's.

Serri also argues that the University's stated reason for firing her was untrue since she presented evidence that she had prepared partial AAP's for 2005 and 2006, and the University prevented her from preparing complete AAP's by failing to provide data and a consultant. But it was undisputed that Serri did not prepare the narrative portion of the AAP (the part that she prepared as contrasted with the parts that her assistant prepared)

46

for three years, and that she prepared the draft narratives she presented to McDonald and Father Locatelli on the eve of their October 13, 2006 meeting.

Serri also relies on her deposition testimony that in 1992, 1993, or 1994, after she showed one of her first AAP's to Father Locatelli, she "sensed" that he was reluctant to sign it. Serri testified that Father Locatelli questioned whether the goals set forth in the AAP were quotas and that she "sensed he was not getting it and it was a source of discomfort for him, so she never showed it to him again." That Father Locatelli raised questions about the goals set in early AAP's, long before the University became a federal contractor, does not mean that he and the University did not recognize the need to comply with the AAP requirement after it became a federal contractor in 2000.

Serri also relies on her deposition testimony that Father Locatelli refused to supervise her after 2003 and never asked her about the AAP's. Based on this evidence, Serri argues that since the lack of an AAP was of no concern to Father Locatelli, he could not use her failure to prepare the AAP's between 2004 and 2006 as an excuse to fire her and that, therefore, the reason given for her termination was a pretext.

Citing Fox's declaration, Serri argues that the University knew that any noncompliance with the AAP requirement was easily correctable with an AAP consultant and that it would not result in any adverse consequences for the University. Serri's argument on this point fails, however, because Fox's declaration was prepared in August 2011, more than four years after Serri was terminated. Serri does not point to any evidence that anyone at the University knew that the lack of an AAP would allegedly not result in adverse consequences when the University terminated her in March 2007. To the contrary, undisputed evidence indicates that Serri (the only person at the University with any experience in this area) told McDonald and Father Locatelli that the existing AAP was indefensible and that the University was likely to be audited by the federal government.

47

Having reviewed Serri's evidence and arguments, we conclude that a trier of fact could not reasonably conclude that the University's stated reasons for terminating Serri "were implausible, or inconsistent or baseless." (*Hersant*, *supra*, 57 Cal.App.4th at p. 1009.) We therefore hold that Serri has not met her burden of producing substantial evidence that the University's reason for terminating her were pretextual or false and used merely to veil an unlawful act of discrimination.[15] (*Ibid.*)

Serri also contends that she proved discriminatory animus. Serri relies on the following evidence. Her successor (Hirsch) was a white female. McDonald and Hirsch, who were Caucasian females, were allowed to hire an AAP consultant. Serri argues that since there was no real reason to fire her or treat her differently, the only logical explanation for the different treatment is her national origin.[16] But in her opening brief, Serri herself explained why the University had to hire an AAP consultant for Hirsch and McDonald: "Hirs[c]h had no ability to prepare AAPs" and McDonald "had <u>no</u> AAP

---

[15] At oral argument, Serri argued that this case was similar to *Cheal v. El Camino Hospital* (2014) 223 Cal.App.4th 736, a recent decision of this court that reversed a summary judgment in a wrongful termination case based on age discrimination. In our view, this case is distinguishable from *Cheal*. The discharged employee in *Cheal* was terminated for making several errors in the preparation of patient meals. In opposition to the employer's motion, the employee presented evidence that, given the nature of the work, the hospital expected mistakes; that her mistakes did not exceed the standards the hospital had set for acceptable performance; and that other employees were not disciplined for making the same types of mistakes. (*Id.* at pp. 740-754.) The employee also presented evidence of discriminatory animus by her supervisor based on the supervisor's statement to a former friend that she favored younger workers. (*Id.* at pp. 754-761.) Unlike the employee in *Cheal*, who did her assigned tasks but arguably made mistakes within an acceptable range of performance, Serri did not perform an important function of her position for three years and then misrepresented the existence of certain AAP's to Father Locatelli and other University personnel.

[16] Serri argues that she was the only high ranking Puerto Rican or Latina staff member at the University. However, she does not point to any evidence in the record that supports that contention.

48

experience." On the other hand, Serri had been preparing AAP's since 1992 and held herself out as the University's expert on AAP's.

Serri also claims disparate treatment. She argues that she was treated differently from a high-ranking "white male who made massive job performance errors" that cost the University "over $6 million" but was "not fired or even demoted." In support of this contention, Serri produced a newspaper article that appeared in the Metro (a Silicon Valley weekly newspaper) in November 2003. There is no evidence the newspaper article was produced by Defendants in discovery and Kornhauser, Serri's counsel, failed to authenticate it in his declaration. In addition, the article is clearly hearsay. Defendants objected to the article on the grounds of authentication and hearsay; none of the hearsay exceptions Serri advanced in response to the objection apply.[17] We therefore hold that the newspaper article was inadmissible and the court properly sustained the Defendants' objections to it. Most importantly, the article does not support the factual assertions for which it is cited in Serri's brief. We shall therefore disregard Serri's arguments based on the newspaper article.

Serri also argues that Father Locatelli and Joe Sugg, an employee in the University's facilities department, made "repeated" stray remarks about her ethnicity and that "ethnic remarks, even 'stray remarks' when coupled with other evidence of pretext can defeat summary judgment." But the argument portion of her brief does not state what those remarks were or tell us where we can find evidence of those remarks in the 5223-page record. As to this contention, Serri has failed to meet her burden on appeal of

---

[17] Serri argued, incorrectly, that the article was not hearsay because she would testify about it at trial and that it came in to show her state of mind. In her opposition to the motions, however, she relied on it to prove the truth of the matter asserted therein, not her state of mind. She also asserted that it was admissible under exceptions to the hearsay rule for past recollection recorded, as a prior consistent statement, a business record, and under the publication exception for historical works, books of science or art, maps and charts (Evid. Code, §§ 1237, 1236, 1270, 1341). None of these exceptions to the hearsay rule apply.

49

providing reasoned argument as to each point raised. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*).) We will, nonetheless, address her contentions by considering statements made in other parts of her brief.

Under the stray remarks doctrine, which has been employed by federal courts and some California courts, on summary judgment, "a 'stray' discriminatory remark that a court determines is unconnected to the adverse employment action is insufficient evidence of a discriminatory motive, as a matter of law, and may be wholly disregarded by the court." (*Sandell v. Taylor-Listug, Inc*. (2010) 188 Cal.App.4th 297, 320 (*Sandell*).) In *Reid*, the Supreme Court held that California courts are not to apply the stray remarks doctrine because "its categorical exclusion of evidence might lead to unfair results." (*Ibid.*, citing *Reid*, *supra*, 50 Cal.4th at p. 517.) Instead, such remarks are to be considered along with all the other evidence in the record in determining whether a rational inference of discrimination exists. (*Sandell*, at p. 320.)

In her statement of facts, Serri points to her deposition testimony that Father Locatelli made a discriminatory remark about her clothing once when he said the shawl she was wearing looked like a poncho, and that he made an ethnic remark when he told her he liked her hairstyle better when she blew her curly hair dry because it looked more relaxed and professional. Serri also relies on her deposition testimony that Father Locatelli was "abusive" toward her when he met her in public. According to Serri, instead of saying " 'Hi' " or asking " 'How are you,' " he would say, " 'What do you want?' " But Serri does not explain how these statements relate to her ethnicity or national origin. People of many ethnicities and national origins, for example, have curly hair. Nor do we see anything derogatory in saying her shawl looked like a poncho.

Serri claims Joe Sugg made a discriminatory and demeaning remark to her in 2000 when he showed her a potential site for her new office in a building on the outskirts of campus. He said, " 'It's a wonderful location, look at all the nice places to eat around here,' " which Serri understood to mean a nearby taqueria. Serri also cites the deposition

testimony of Jane Curry in which Curry stated that her (Curry's) department head told Curry she would be paid better if she was less outspoken, not divorced, and Catholic. Serri argues this evidence supports the conclusion that Father Locatelli did not like women, did not like Latinas, and condoned a discriminatory atmosphere at the University.[18]

In our view, this evidence does not demonstrate a discriminatory animus or motive. At best, even when examined in the aggregate, this evidence raised only a weak suspicion that discrimination was a basis for Serri's termination. This weak suspicion may have sustained Serri's burden of proving a prima facie case, but it does not amount to substantial evidence of discrimination necessary to defeat summary judgment.

We conclude that Serri failed to meet her burden of producing substantial evidence that the University's stated reasons for firing her were untrue or pretextual, or that the University acted with a discriminatory animus, such that a reasonable trier of fact could conclude that the University engaged in intentional discrimination or other unlawful action. (*Cucuzza*, *supra*, 104 Cal.App.4th 1031, 1038.)

### E. Second and Tenth Causes of Action: The Trial Court Properly Granted Summary Adjudication of Serri's Tortious Discharge and Retaliation in Violation of the FEHA Claims

Serri's tenth cause of action alleges that the University terminated her in retaliation for her "lawful and protected actions in pursuing discrimination, harassment, and equal pay claims with the EEOC and DFEH." Her second cause of action for tortious

_____

[18] In her statement of facts, Serri also complains that Father Locatelli did not reprimand Sugg for "repeating a distasteful sexist remark about a woman's period and tried to stop Serri's investigation into the matter." Contrary to Serri's assertion, the record suggests Father Locatelli took her complaint against Sugg seriously and allowed it to be handled through the Policy 311 process. And although this is mentioned in her statement of facts, Serri's brief does not argue that this demonstrated any discriminatory animus.

51

discharge also alleges that she was fired in retaliation for filing complaints with the EEOC and DFEH.

Serri argues that the University retaliated against her by removing her AAP duties on October 19, 2006 (two weeks after she filed her first DFEH claim) and terminating her on March 7, 2007. Her only contention on appeal regarding these two causes of action, separate and apart from her argument regarding her discrimination claim, is that "[t]he close timing between her EEOC filings and her termination is circumstantial evidence that she was terminated for exercising her public policy right to enforce state and federal anti discrimination laws." *Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102 held that a prima facie showing of "temporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the [employee's burden] to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual." (*Id.* at p. 1112.) Since we have already concluded that Serri cannot meet her burden of showing that the stated reasons for her termination were false or pretextual, we reject her contention that the timing in this case, in itself, was sufficient to create a triable issue regarding her tortious discharge and retaliation claims.

### F. Eleventh Cause of Action: The Trial Court Properly Granted Summary Adjudication of Serri's Harassment Claim

Serri's eleventh cause of action alleges harassment in violation of the FEHA (Gov. Code, § 12940, subd. (j)) by the University, Father Locatelli, McDonald, and Veit on account of Serri's national origin, age, and sex.[19]

---

[19] The complaint alleges that: (1) Father Locatelli harassed Serri by falsely accusing her of lying, not performing her job, and being incompetent; (2) McDonald and Veit created a hostile work environment and harassed her by continually and repeatedly questioning her honesty, and saying and implying that she was a liar and could not be trusted to perform her job; and (3) McDonald and Veit harassed her by insisting that Veit sit in and make a record of all of McDonald's meetings with Serri.

Government Code section 12940, subdivision (j), defines "unlawful employment practice" to include harassment in the workplace based on national origin, sex, and age. "Under the statute 'harassment' in the workplace can take the form of 'discriminatory intimidation, ridicule and insult' that is ' " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " ' [Citations.] Moreover, harassing conduct takes place 'outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives.' (*Reno v. Baird* (1998) 18 Cal.4th 640, 646 . . . .) 'Thus, harassment focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee.' (*Roby v. McKesson Corp*. (2009) 47 Cal.4th 686, 706 . . . . [(*Roby*)])" (*Rehmani v. Superior Court* (2012) 204 Cal.App.4th 945, 951 (*Rehmani*); italics in original.)

Harassment is distinguishable from discrimination under the FEHA. "[D]iscrimination refers to bias in the exercise of official actions on behalf of the employer, and harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace." (*Roby*, *supra*, 47 Cal.4th at p. 707.) As our high court explained in *Reno v. Baird,* "Harassment claims are based on a type of conduct that is avoidable and unnecessary to job performance. No supervisory employee needs to use slurs or derogatory drawings, to physically interfere with freedom of movement, to engage in unwanted sexual advances, etc., in order to carry out the legitimate objectives of personnel management. Every supervisory employee can insulate himself or herself from claims of harassment by refraining from such conduct. An individual supervisory employee cannot, however, refrain from engaging in the type of conduct which could later give rise to a discrimination claim. Making personnel decisions is an inherent and unavoidable part of the supervisory function. Without making personnel decisions, a supervisory employee simply cannot perform his or her job duties." (*Reno v. Baird*,

*supra*, 18 Cal.4th at p. 646, quoting *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 63-65 (*Janken*).)  The court explained further "that the Legislature intended that commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment.  These are actions of a type necessary to carry out the duties of business and personnel management.  These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment.  Harassment, by contrast, consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management." (*Reno v. Baird,* at pp. 646-647.)

"Whether the conduct of the alleged harassers was sufficiently severe or pervasive to create a hostile or abusive working environment depends on the totality of the circumstances.  ' "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." '  [Citations.]  ' "Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct [that] a reasonable person in the plaintiff's position would find severely hostile or abusive.' "  [Citations.]  As in sex-based harassment claims, '[t]he plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's [fn. omitted] work performance and would have seriously affected the psychological well-being of a reasonable employee and that [he or she] was actually offended.' [Citations.]" (*Rehmani*, *supra*, 204 Cal.App.4th at pp. 951-952.)

Serri contends the court erred in granting summary adjudication of her harassment claim because she produced evidence that McDonald falsely accused her of being a liar and untrustworthy, and that "they" intimidated and humiliated her by insisting that Veit attend and take notes at Serri's regular meetings with McDonald. Without citation to evidence in the record, Serri argues that she "was the only [University] employee subjected to this type of humiliation" and asserts that she was treated this way because she is Puerto Rican.

In support of their motions for summary adjudication, both McDonald and Veit declared that they did not make any hostile or derogatory statements to or about Serri at their meetings and that they never made any derogatory references to her race, gender, ethnicity, or other protected status. Although Serri's separate statement stated that she "disputed" these facts, none of the evidence she cited created a triable issue on the question whether McDonald or Veit ever made any derogatory remarks about Serri's national origin, age, or sex, or that they engaged in other conduct that constitutes harassment. Thus, the record is devoid of any evidence that McDonald and Veit engaged in harassing conduct of the type described in *Reno v. Baird* and *Janken*. The conduct Serri complains of involves McDonald's decisions about who would attend her meetings with Serri and how those meetings were conducted. As *Reno v. Baird* instructs, while these allegations may involve discrimination (a claim we have already concluded has no merit), they are not harassment. For these reasons, we hold that the court properly granted McDonald's and Veit's motions for summary adjudication of Serri's harassment claim.

As for her harassment claim against Father Locatelli, Serri argues that she produced evidence that Father "Locatelli and his subordinates, made and approved of disparaging ethnic remarks about moving her office next to a taqueria[,] . . . criticized her dress as looking like a poncho and criticized her hair as too curly." This is the full extent of her argument regarding this claim. As we have explained, to prevail on her

55

harassment claim, Serri is required to produce evidence that she was subjected to offensive comments or other abusive conduct that was based on a protected characteristic (her national origin, age or sex) that was sufficiently severe or pervasive as to alter the conditions of her employment. In our view, Joe Sugg's remark in 2000 that there are "nice places to eat around here" and Father Locatelli's statements that he liked Serri's hairstyle better when she blew her curly hair dry because it looked more relaxed and professional and that her shawl looked like a poncho are not derogatory or offensive or the type of statements that "would have interfered with a reasonable employee's . . . work performance and would have seriously affected the psychological well-being of a reasonable employee." (*Rehmani*, *supra*, 204 Cal.App.4th at pp. 951-952.) Moreover, these three comments, made over the course of six years, were not so pervasive as to support a claim for harassment. We conclude that the court did not err when it granted the University's and Father Locatelli's motion for summary adjudication of the Serri's harassment claim.

### G. Third Cause of Action: The Trial Court Properly Granted Summary Adjudication of Serri's Equal Pay Act Claim

Serri's third cause of action alleged a violation of Labor Code section 1197.5, the California Equal Pay Act (EPA), against the University only. Although Serri's complaint did not name one or more "comparators,"[20] based on her arguments in the papers below and on appeal, it appears the only comparator she relies on is Charles Ambelang.

Recovery under the EPA is limited to a two-year period. (*Jones v. Tracy School Dist*. (1980) 27 Cal.3d 99, 107.) Although the record contains wage information going back to 1997, for the purpose of our analysis we begin with October 2004, two years before Serri filed her wage claim with the DFEH. At that time, Serri made $104,328.48

---

[20] "Comparator" is a term of art in EPA cases; it refers to the person or persons of the opposite sex whose pay the claimant's pay is compared to. (*Hein v. Oregon College of Education* (9th Cir. 1983) 718 F.2d 910, 912, fn. 2.)

per year (all further salary figures are annual earnings) and Ambelang, who worked 11 months per year, made the equivalent of $117,040.17 for full-time work. Between July 2004 and July 2005, Ambelang's work schedule increased to full time. In July 2005, Serri received a 3.5 percent merit increase, raising her salary to $107,980.08. Ambelang received a 4.0 percent merit increase, increasing his pay to $121,721.76. In July 2006, the University made an equity adjustment to Serri's salary retroactive to March 2005, increasing her pay to $118,350.00. Serri also received a 3.5 percent merit increase in July 2006, raising her salary to $122,492.25. Ambelang, on the other hand, received a 4.0 percent merit increase, increasing his pay to $126,590.63.

Labor Code section 1197.5 provides in relevant part: "(a) No employer shall pay any individual in the employer's employ at wage rates less than the rates paid to employees of the opposite sex in the same establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where the payment is made pursuant to a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a differential based on any bona fide factor other than sex." Because the California EPA is nearly identical to the federal Equal Pay Act of 1963 (29 U.S.C. § 206(d)(1)), in the absence of California authority, courts rely on federal authorities construing the federal statute to interpret analogous provisions of the state statute and to evaluate claims under the California EPA. (*Hall v. County of Los Angeles* (2007) 148 Cal.App.4th 318, 323, fn. 4 (*Hall*); *Green v. Par Pools, Inc*. (2003) 111 Cal.App.4th 620, 623 (*Green*).)

To prevail on her EPA claim, Serri has the burden to prove that " 'an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." ' " (*Green*, *supra*, 111 Cal.App.4th at p. 623, quoting *Corning Glass Works v. Brennan* (1974) 417 U.S. 188, 195.) If Serri

establishes a prima facie case by showing that the University has paid different wages to male and female employees for equal work, the burden then shifts to the University to show justification for the differential by establishing one of the exceptions in the EPA, namely that payment was "made pursuant to a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a differential based on any bona fide factor other than sex." (*Green*, at p. 623.)

"In broad terms, the EPA defines what constitutes equal work by specifying that jobs are equal if their performance requires 'equal skill, effort, and responsibility' and they are performed under 'similar working conditions.' [Citation.] A plaintiff need only show that 'the jobs [being compared] are substantially equal, not necessarily that they are identical.' [Citation.] In assessing a plaintiff's claim of substantial equality between jobs, a court should rely on actual job performance and content rather than job descriptions, titles, or classifications. [Citations.] Courts necessarily must determine the issue of substantial equality on a case-by-case basis. [Citation.] The EPA's requirements that the two jobs being compared require substantially equal skill, effort, responsibility, and be performed under similar working conditions are separate tests, each of which must be met in order to state a claim under the EPA. [Citations.]" (*Forsberg v. Pacific Northwest Bell Tel. Co.* (9th Cir. 1988) 840 F.2d 1409, 1414 (*Forsberg*).) Although Serri is not required to show that her work was identical in every respect to the work of the male comparator, she must show that any difference in their content was so insignificant that it did not contribute to the pay disparity. (*Shultz v. Wheaton Glass Co.* (3d Cir. 1970) 421 F.2d 259, 265.)

In its motion for summary adjudication of the EPA claim, the University argued that Serri could not establish the third element of her cause of action—that the two jobs required " 'equal responsibility.' " Equal responsibility means "the degree of accountability required in the performance of the job, with emphasis on the performance of the job obligation." (29 C.F.R. § 1620.17(a).)

During the relevant time period, Ambelang was the Director of Organizational Learning and Development. His primary duties included (1) directing organizational learning and development learning programs and initiatives, (2) directing staffing and service operations, (3) overseeing the University's childcare center (Kids on Campus), (4) overseeing employee relations, and (4) serving as a member of the human resources management team. As Director of Affirmative Action, Serri's primary duties included (1) handling discrimination claims under Policy 311, (2) drafting and implementing the AAP, and (3) conducting sexual harassment training. None of these primary duties overlap.

In support of its motion, the University presented evidence that Ambelang was responsible "for supervising four areas (Kids on Campus, Employee Relations, Front Desk, and Training [and] Development staff)." He directly supervised "at least two to three employees, who in turn supervised additional employees (some of whom . . . supervised student employees)." In contrast, Serri was responsible for supervising only one department, in which she supervised only one employee, her administrative assistant. In addition, Ambelang was the "number two" person in the Human Resources department; he was in charge of the department whenever McDonald was not present. Regulations interpreting the federal EPA provide that an employee who is required to assume supervisory duties when a regular supervisor is absent may receive a higher rate of pay for this additional responsibility. (29 C.F.R. § 1620.17(b)(1).)

Serri attempts to create a triable issue of fact regarding the differences in their levels of responsibility with (1) an excerpt from Ambelang's deposition, describing the position he held when first hired by the University in 1981; (2) copies of their written job descriptions; (3) a memorandum describing the different pay grades recognized by the University in fiscal year 2005-2006; and (4) a memorandum and a chart comparing Serri's and Ambelang's salaries that McDonald prepared for Manchester's investigation. In her opposition to the motion, Serri pointed out similarities between the two jobs. She

also argued that she was at a higher pay grade than Ambelang, was the head of her department, and reported directly to the University President.

As we have noted, when determining whether two jobs are substantially equal, "a court should rely on actual job performance and content rather than job descriptions, titles, or classifications." (*Forsberg*, *supra*, 840 F.2d at p. 1414; 29 C.F.R. 1620.13(e).) Thus, that Serri was at a higher pay grade than Ambelang is not outcome determinative. Importantly, Serri's argument and evidence did not dispute the University's evidence regarding the differences in supervisory responsibility between the two jobs, in particular the numbers of departments and persons supervised. This was the element that was at issue in the University's motion.

We conclude that (1) the University met its burden of demonstrating that Serri could not state a cause of action based on a violation of the EPA because she could not demonstrate that the two positions involved equal responsibility; and (2) Serri's showing did not create a triable issue of material fact regarding that element. Thus, the court properly granted summary adjudication of Serri's EPA claim.

### H. Fourth and Fifth Causes of Action: The Trial Court Properly Granted Summary Adjudication of Serri's Breach of Contract and Bad Faith Claims

Serri's fourth cause of action for breach of contract alleged that she was not an at-will employee and that her employment contract with the University was "partially oral, partially written in the form of [the University's] Staff Policy Manual." Serri alleged that her employment contract contained promises that she would not be discharged except for good cause and that she would be afforded progressive discipline or remediation if there were problems with her job performance. She alleged that the University breached her employment contract when it terminated her without good cause and without an opportunity to correct any improper conduct. Serri's fifth cause of action alleged that the

University breached the implied covenant of good faith and fair dealing in her employment contract.

The University's Policy 310 sets forth the University's policies and procedures regarding "Corrective Action for Performance Problems" and outlines the steps to be taken when performance problems arise. It also provides: "In some circumstances the problem is so serious that extraordinary measures other than typical corrective action may need to be taken. Examples of such problems include gross misconduct . . . . Examples of extraordinary measures include suspension, and/or termination. [¶] If the corrective action is unsuccessful or the problem is so severe as to render corrective action inappropriate or impractical, termination of employment can occur."

In granting summary adjudication of the fourth and fifth causes of actions, the trial court found that the contract permitted termination without an opportunity for corrective action, that the University had good cause to terminate Serri, and that Serri failed to raise a triable issue whether the University acted in good faith or that its reasons for firing her were arbitrary or capricious.

"Good cause" in the context of implied employment contracts is defined as: "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond." (*Cotran v. Rollins Hudig Hall Internat., Inc*. (1998) 17 Cal.4th 93, 107-108.) "Three factual determinations are relevant to the question of employer liability: (1) did the employer act with good faith in making the decision to terminate; (2) did the decision follow an investigation that was appropriate under the circumstances; and (3) did the employer have reasonable grounds for believing the employee had engaged in the misconduct." (*Silva v. Lucky Stores, Inc*. (1998) 65 Cal.App.4th 256, 264 (*Silva*) "*Cotran* did not delineate the earmarks of an appropriate

investigation but noted that investigative fairness contemplates listening to both sides and providing employees a fair opportunity to present their position and to correct or contradict relevant statements prejudicial to their case, without the procedural formalities of a trial." (*Ibid.*, citing *Cotran*, at p. 108.)

Serri contends that it was up to a jury to decide whether the University "honestly and objectively reasonably" believed that her conduct was egregious enough to be "gross misconduct" and that the court therefore erred in granting summary adjudication of her fourth cause of action for breach of contract. Although the elements of the *Cotran* standard are triable to the jury, "if the facts are undisputed or admit of only one conclusion, then summary judgment may be entered . . . ." (*Silva*, *supra*, 65 Cal.App.4th at p. 264.)

Serri argues that the University did not have good cause to terminate her because it prevented her from preparing the AAP's. She asserts that she did not commit "gross misconduct" and that she presented evidence that preparing the AAP was a minor job duty, that failure to prepare a fully compliant AAP was not significant and would not result in any harm to the University, and that the problem was easily correctable by providing her with an AAP consultant. She also contends the University must not have considered her acts to be gross misconduct, since it did not fire her right away, and that it acted arbitrarily by firing her for a relatively insignificant failure that resulted in no harm.

Undisputed facts established that Serri's job duties included preparing the annual AAP and that she did not prepare the narrative portion of the AAP (the part that Serri, as opposed to her assistant, was charged with preparing) for three years. Serri also told the University that the draft AAP's she presented were indefensible and that the University was likely to be audited by the OFCCP.

Although Serri does not address this point in her opening brief, the University's termination letter stated three reasons for her termination: (1) failing to prepare the AAP for three years; (2) failing to disclose the problem to her supervisors; and (3) making

misrepresentations related to the AAP's.  The University argues that the third reason alone constituted "good cause" to terminate Serri's employment.  It asserts:  "Lack of forthrightness and dishonesty are not deficiencies in skill or ability that may be improved by corrective action or additional training.  . . .  These are matters of integrity and trustworthiness."  The University relies on the following language from *Cotran*:  " 'Care must be taken, however, . . . not to interfere with the legitimate exercise of managerial discretion. . . . [Citation.]  And where . . . the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment.' "  (*Cotran*, *supra*, 17 Cal.4th at p. 100.)  In *Cotran*, our high court also stated, " '[A]n employer must have wide latitude in making independent, good faith judgments about high-ranking employees without the threat of a jury second-guessing its business judgment.  Measuring the effective performance of such an employee involves the consideration of many intangible attributes such as personality, initiative, ability to function as part of the management team and to motivate subordinates, and the ability to conceptualize and effectuate management style and goals.' "  (*Id*. at pp. 100-101.)  The University argues that even if Serri's failure to prepare the AAP's could be corrected by hiring a consultant, that would not change the fact that Serri concealed her failure from the University, and that other University employees certified the existence of AAP's Serri had not prepared.  Dodson's e-mail from September 2004, which Serri received, illustrates the concern.  He stated, "As the person who has to sign compliance assurances for federal grants, I am not willing to lie."

Based on all of the admissible evidence in this case, we conclude that the University met its burden of establishing that it acted in good faith and had reasonable grounds for believing Serri engaged in gross misconduct when it decided to terminate her and that its decision was based on "fair and honest reasons."  In cannot be reasonably asserted that termination for misrepresenting the status of an important report that impacted the work of other University departments was "trivial, arbitrary or capricious"

63

or unrelated to the University's business needs or goals. (*Cotran*, *supra*, 17 Cal.4th at pp. 107-108.) And as we have already held, the University has established that its reasons for terminating Serri were not pretextual, and Serri has failed to raise a triable issue on that point.

As summarized above, Serri argues that her failure to prepare complete AAP's for three years was not gross misconduct, the type of conduct that would be grounds for termination without corrective action under her contract. But even if Serri's evidence created a triable issue with regard to the question whether the failure to prepare AAP's for three years was gross misconduct, it does not create a triable issue on the question whether she misrepresented the existence of the AAP's to her supervisors and other employees at the University. When Father Locatelli asked Serri to bring the AAP's for the last ten years to their October 13, 2006 meeting, she wrote in an e-mail that she was working on the current plan, promised to bring her draft and the previous year's plan, and implied that prior AAP's had been destroyed in accordance with industry standards. In fact, there was no plan for the previous year. It was undisputed that Serri created the two draft plans she presented at the meeting the night before the meeting. And the record demonstrates that the plans for prior years had not been destroyed; Serri's own evidence includes a copy of the AAP for August 2002 through August 2003. In addition, Campbell declared that she talked to Serri two or three times a year about the AAP certifications and the Serri never told her the University did not have an AAP. In September 2006, when Campbell asked Serri whether they could release a copy of the AAP to the City of San José, rather than tell Campbell there was no current AAP, Serri said the University did not release it. Serri also offered to send Campbell a "sanitized version" of the AAP, which Serri testified meant the narrative summary, even though there was no narrative summary at that point in time. In summary, even if Serri's evidence created a triable issue on the question whether the failure to prepare the AAP's was gross misconduct, it did not create a triable issue on the question whether she made

64

misrepresentations regarding the AAP's, which ground was sufficient by itself to demonstrate gross misconduct.

As for Serri's contention that the timing of her termination demonstrates that she did not commit gross misconduct, although Warren was concerned about Serri's misconduct in October 2006, he decided to wait until after the investigations of her Policy 311 claims were completed before deciding what to do. Independent investigator Fredkin completed the investigation of Serri's second claim in January 2007; [21] Serri appealed his findings, which were affirmed by the Board on February 13, 2007. Serri was thereafter terminated in March 7, 2007. In our view, this sequence of events does not support Serri's contention. We conclude that the court properly granted summary adjudication of Serri's breach of contract claim. In addition, Serri's breach of the covenant of good faith and fair dealing claim falls with her breach of contract claim. (*Guz*, *supra*, 24 Cal.4th at p. 350 ["if the employer's termination decisions . . . do not breach . . . a substantive contract provision, they are not precluded by the covenant"].) Serri does not contend otherwise.

---

[21] In our view, the University's investigation more than met the standards in *Cotran* and *Silva*. The investigation was "appropriate under the circumstances" and provided Serri "a fair opportunity to present [her] position and to correct or contradict relevant statements prejudicial to [her] case, without the procedural formalities of a trial. (*Cotran*, *supra*, 17 Cal.4th at p. 109; *Silva*, *supra*, 65 Cal.App.4th at p. 264; see, e.g. *King v. United Parcel Service, Inc*. (2007) 152 Cal.App.4th 426, 439-440 [investigation adequate as a matter of law where neutral company personnel investigated the facts, eyewitnesses provided statements, and the plaintiff was given an opportunity to explain what happened].) Both times, the University hired experienced, outside counsel to investigate Serri's claims; the investigators interviewed Serri and other witnesses, and produced a written report. And the University provided Serri an opportunity to appeal to the University's Board of Trustees.

## I. Sixth Cause of Action:  The Trial Court Properly Granted Summary Adjudication of Serri's Defamation Claims

Serri's sixth cause of action alleged that she was defamed by the University (through its agents Father Locatelli, Warren, and McDonald) by "falsely stating . . . and falsely implying that [she] was incompetent," by falsely claiming that she had failed to prepare the AAP's, and "falsely stating that she had to be terminated because she was incompetent."  The complaint did not identify the persons to whom the allegedly false statements were published, but did allege that Serri was forced to republish "these false accusations" to the EEOC, DFEH, and potential employers.

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720, overruled on another ground as stated in *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 380.)  Warren, McDonald, Father Locatelli, and the University moved for summary adjudication of the defamation claims.  They argued:  (1) the statements in the termination letter and other statements Serri relied on were true, (2) Serri had not identified anyone who said she was "incompetent," (3) any communications among University officials about her performance were subject to the common interest privilege, and (4) no one from the University made the statements Serri voluntarily republished.

The trial court granted summary adjudication of the defamation claims.  It found that:  (1) statements among University officials about Serri's performance were privileged under the common interest privilege; (2) statements regarding her failure to complete the AAP's were true; (3) there was no evidence McDonald made any statements with malice or that anyone other than Serri published such statements outside the University; and (4) Serri failed to establish that her republication of the reasons for her termination fell under the "strong compulsion" rule (*McKinney v. County of Santa Clara* (1980) 110 Cal.App.3d 787, 798).

On appeal, Serri advances five arguments regarding her defamation cause of action. First, she contends the trial court erred in applying the common interest privilege to statements McDonald made to Jocewicz and Ambelang because the privilege does not "protect disclosures to co-workers who have no need to know." Second, she argues that the common interest privilege does not apply to statements Ottoboni made to the search committee charged with finding her replacement. Third, she argues "Warren needlessly brought Ingrid Williams with him to watch him terminate Serri" and suggests such conduct was not covered by the common interest privilege. Fourth, she argues that she was forced to republish the defamation to Esther Perales, an employee of the County of Santa Clara, and that the court erred in rejecting her "strong compulsion" claim. Fifth, she contends the court erred in finding the statement that she had failed to complete the AAP's was true.

## 1. *McDonald's Statements to Jocewicz and Ambelang*

The source of the common interest privilege is Civil Code section 47, subdivision 3, which provides, in pertinent part: "A privileged publication . . . is one made [in] a communication, without malice, to a person interested therein . . . by one who is also interested . . . ."

"The conditional privilege created by section 47, subdivision 3, is lost if the privilege is abused or if the publication was motivated by malice. [Citation.] 'Interested persons' within the meaning of section 47, subdivision 3, have been defined as a communicator and a recipient with a common interest, although to be protected the communication must be one 'reasonably calculated to further that interest.' [Citation.] [¶] Communications made in a commercial setting relating to the conduct of an employee have been held to fall squarely within the qualified privilege for communications to interested persons." (*Cuenca v. Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985, 995 (*Cuenca*).) "[A]n employer may

67

publish to his employees the reasons for termination of another employee, the rationale for the publication being the employer's economic interest in clarifying its policies and preventing future abuses of those policies." (*Id.* at pp. 995-996, citing *Deaile v. General Telephone Co. of California* (1974) 40 Cal.App.3d 841, 849.)

Applying Civil Code section 47, subdivision 3 and *Cuenca* to this case, we first note that Serri mischaracterizes the evidence she relies on. In her brief, Serri argues that after she was fired, McDonald told Ambelang and Jocewicz, "neither of whom supervised Serri or had any need to know why Serri was fired, that Serri was fired for allegedly failing to prepare AAPs (i.e., for incompetence)." In support of this contention, Serri cites excerpts from Jocewicz's and Ambelang's depositions.

The excerpt from Jocewicz's deposition suggests that Jocewicz called Serri in March 2007 and that Serri said she could not talk to her.[22] Jocewicz testified that she then went to McDonald and asked " 'What's going on with Conchita?' " McDonald responded, " 'She's no longer working for the University." Contrary to Serri's contentions, Jocewicz testified that McDonald did not say anything else and did not say why Serri no longer worked for the University.

Ambelang testified that McDonald told him Serri "was not working at the University," that "it was related to . . . her failure to produce certain . . . affirmative action reports," and that McDonald did not tell him anything else about it. While his testimony supports the assertion that McDonald told him Serri was fired for failing to complete the AAP's, it does not support the contention that McDonald said Serri was incompetent.

Neither of the cases Serri cites (*Cuenca* and *Kelly v. General Telephone Co.* (1982) 136 Cal.App.3d 278, 285) limits the common interest privilege to those who supervised a discharged employee or otherwise had a "need to know." In our view, McDonald's communications to Jocewicz and Ambelang clearly fell within the privilege.

---

[22] We say "suggests" because this information comes from counsel's question, not the witness's testimony under oath.

68

Ambelang was second in command in the human resources department and had an interest in knowing how the University enforced its corrective action policy. Jocewicz was Serri's assistant and was wondering why her boss had stopped coming to work. McDonald was very restrained in her response to Jocewicz and did not tell her why Serri was terminated. But if she had, it would have been permissible under *Cuenca* since Jocewicz's duties included preparing portions of the AAP's.[23]

Serri argues that the question whether McDonald made these statements with malice is a disputed fact and that malice can be inferred from the statements themselves, citing the same deposition testimony that we reviewed above. But malice cannot be inferred from the statement itself. (Civ. Code, § 48.) " 'The malice necessary to defeat a qualified privilege is "actual malice" which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights (citations).' [Citations.]" (*Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413, quoting *Roemer v. Retail Credit Co.* (1975) 44 Cal.App.3d 926, 936 [italics in *Roemer*].) Nothing in the evidence Serri cites establishes malice under these rules.

---

[23]  Later in her brief, Serri adds the name "Fong" to the list of persons McDonald allegedly made statements to about Serri's termination. She presumably means Harry Fong. Since Serri's does not cite any evidence regarding statements McDonald made to Fong and does not provide any reasoned argument on this point, we may treat her contentions regarding statements made to Fong as waived. (*Stanley*, *supra*, 10 Cal.4th 764, 793 [when the appellant asserts a point but fails to support it with reasoned argument and citation to authority, appellate court may treat it as waived and pass it without consideration]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [this rule applies to summary judgment appeals].) The Individual Defendants provide a record citation to an excerpt from Fong's deposition, which Serri placed in evidence. Fong testified that he heard Serri was no longer with the University; he could not recall who he heard it from and did not know why she was terminated.

We conclude that the court did not err when it granted McDonald's motion for summary adjudication of the defamation cause of action.

### 2. *Ottoboni's Statements to the Search Committee*

Serri contends that Ottoboni defamed her in July 2007 when he told the search committee charged with finding Serri's replacement that the AAP "had not been . . . done for the past three years." But Serri's complaint does not contain a cause of action for defamation against Ottoboni. Nor does it allege that Ottoboni made defamatory statements as an agent of the University.

The issues on summary judgment or summary adjudication are framed by the pleadings and the motion may not be granted or denied on issues not raised by the pleadings. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253, 1258 (*Laabs*).) A "defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers." (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98-99, fn. 4.) If the opposing party's evidence shows some factual assertion, legal theory, or claim not yet pleaded, that party should seek leave to amend before the hearing on the motion. (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264-1265.) Since Serri's complaint does not allege defamation by Ottoboni and she did not seek leave to amend, this issue is not properly before us.

### 3. *Warren's Act of Bringing Williams With Him Was Privileged*

Without argument or citation to authority, Serri challenges the trial court's finding that any publications by Warren were conditionally privileged under the common interest privilege, arguing that she produced evidence that "Warren needlessly brought Ingrid Williams with him to watch him terminate Serri." Warren declared that when he delivered the termination letter to Serri, he "was accompanied by a representative from

70

Human Resources . . . to assist Ms. Serri in gathering her belongings." Serri testified that Ingrid Williams worked for McDonald, that Warren simply handed her (Serri) the letter, and did not say anything to her in front of Williams. Serri's evidence indicates that Williams was the University's Director of Benefits, Compensation, and Payroll. Warren's termination letter asked Serri to contact Williams "to make arrangements to turn in any University property and to remove your personal effects from your office."

To prevail on her defamation claim against Warren, Serri must prove that he *published* defamatory matter, i.e., that he communicated it to some third person who understood its defamatory meaning and application to Serri. (*Ringler Associates v. Maryland Casualty Co*. (2000) 80 Cal.App.4th 1165, 1179.) It is not clear from the record whether Warren ever made any statements to Williams about Serri's termination, and Serri does not point to any evidence that he published defamatory material to Williams. But since Williams was the human resources employee charged with ensuring that the logistical details of Serri's separation were accomplished smoothly, even if Warren had told Williams the reasons why Serri was fired, such statements would have been covered by the common interest privilege.

In addition, Serri does not cite any evidence that Warren acted with malice that vitiated the privilege. As we have noted, the " 'malice necessary to defeat a qualified privilege is "actual malice" which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights . . . .' " (*Sanborn*, *supra*, 18 Cal.3d at p. 413.) Serri argues that malice could be inferred since Warren knew the University prevented her from completing the AAP's and the accusations against her were false, yet Warren refused to give her an opportunity for corrective action and fired her. But as we have stated, the University was not required to give Serri an opportunity for corrective action and the evidence supports the conclusion that the reasons given for Serri's discharge were

71

true and that Warren believed them to be true. Thus, Serri's has not created a triable issue that precludes application of the common interest privilege.

### 4. Serri's Republication to Esther Perales

Serri argues that she "was forced to self publish her termination to prospective employers because they would ask and want to know why she was no longer at [the University] and would probably check to verify her explanation." In support of this contention, she cites her own deposition in which she testified that Esther Perales, who was employed by Santa Clara County, asked her why she left the University. Serri testified that she served on one of Perales' advisory boards and that she told Perales she "didn't leave" the University, she "was fired."

Serri relies on *Live Oak Publishing Co. v. Cohagan* (1991) 234 Cal.App.3d 1277, 1284, which explains that "a plaintiff cannot manufacture a defamation cause of action by publishing the statements to third persons; the publication must be done by the defendant." There is an exception to this rule, which the *Live Oak* court refers to as the "coerced republication rule" (*id*. at p. 1287) and which the parties and other cases refer to as the "strong compulsion" rule. In the employment context, the exception requires a showing that the employee was required to republish the defamation to explain a negative job reference or derogatory material placed in the employee's personnel file. (*Id.* at p. 1285; *Davis v. Consolidated Freightways* (1994) 29 Cal.App.4th 354, 373 (*Davis*).) In *Davis*, a summary judgment case, the court found that the employee had "failed to establish . . . any fact or triable issue of fact that there was any 'strong compulsion' to republish the alleged defamatory matter to prospective employers, because he failed to show there was ever any 'negative job reference' attributable to [the employer] that plaintiff had to explain." (*Davis*, at p. 373.)

The holding in *Davis* applies here. McDonald, Warren, Veit and Ottoboni all declared that they did not discuss Serri's job performance or termination with anyone

72

outside the University (except for the attorneys in this case), did not receive any requests for job references for Serri, and never discussed her performance with potential employers or Serri's clients (Serri had a consulting business). In addition, McDonald declared that she was not aware of anyone at the University who responded to a request for a job reference for Serri. Simply put, the evidence Serri cites does not create a triable issue regarding any of these facts or the application of the strong compulsion exception. There is no evidence that Perales was a potential employer. Instead, Serri served on an advisory board with Perales and voluntarily disclosed that she had been terminated by the University.

### 5. *Truth of Statement that Serri Failed to Complete AAP's*

Serri also argues that "the trial court's ruling that the statements that Serri failed to complete the AAP[']s was true, and therefore a defense to defamation, is incorrect" because the University prevented her from completing the AAP's. Serri does not discuss this issue in the context of a particular allegedly defamatory statement by any defendant. Serri, who was charged with preparing the narrative portion of the AAP, admitted in deposition that she did not prepare the narrative in 2004 and that she prepared the two narrative summaries she presented at her October 13, 2006 meeting with Father Locatelli the night before. The excuses that she offers to explain *why* she did not prepare the AAP's does not render the statement that she did not prepare them untrue or create a triable issue regarding this point. We therefore reject her contention that the court erred when it found the statement that she failed to prepare the AAP's to be true.

We conclude that Serri has failed to meet her burden to demonstrate a triable issue of material fact regarding her defamation claims and that the court properly granted the motions for summary adjudication of that claim.

**J. Seventh and Eight Causes of Action: The Trial Court Properly Granted Summary Adjudication of Serri's Intentional and Negligent Infliction of Emotional Distress Claims**

Serri's seventh cause of action for intentional infliction of emotional distress alleged, in part, that the University, Father Locatelli, Warren, and McDonald "made . . . false accusations about Serri's incompetence and reasons for termination with the intention or knowledge that they were false and with malice" with "the knowledge and intent" that their "actions in making these false and defamatory statements would cause Serri severe emotional distress." Serri's eighth cause of action for negligent infliction of emotional distress alleged, in part, that these same defendants "owed Serri a duty of care not to negligently (or falsely) take any actions or communicate falsely that Serri was incompetent as Director of Affirmative Action." Thus, both infliction of emotional distress claims were based on allegedly defamatory statements these defendants made about Serri. In ruling on the motions for summary adjudication, the trial court found that these claims "seek damages for emotional distress resulting from the alleged defamatory statements and therefore fail for the same reasons" as the defamation claim.

On appeal, Serri argues that since she "presented evidence that there was defamation," the trial court erred in its ruling on these claims as well. Since we hold that the trial court properly granted summary adjudication of the defamation claim, we reject this contention.

Serri also argues that "[f]iring someone for no valid reason, and for reasons that Defendants knew they created, is outrageous. These intentional and fraudulent actions, especially by persons with whom she had a long-term relationship as supervisors, who abused their positions of trust with her, are considered outrageous." Serri's complaint, however, did not assert these facts as the basis for her emotional distress claims. As we have stated, the issues on a motion for summary adjudication are framed by the pleadings

74

and since these arguments are not based on the factual allegations of her complaint, we will not consider them further. (*Laabs*, *supra*, 163 Cal.App.4th at pp. 1253, 1258.)

Finally, Serri argues that as a result of Defendants' actions and "the wrongful termination," she suffered severe emotional distress. She asserts she "was severely depressed for months and years, was hospitalized for depression as a result and continues to suffer depression and anxiety as a result of Defendants' actions." But Serri fails to support these assertions with any citations to the record. Both her statement of facts and the argument portion of her brief are devoid of any citation to evidence that supports these contentions. Appellate counsel had a duty to refer us to the portions of the record supporting his contentions on appeal. " 'It is neither practical nor appropriate for us to comb the record,' " especially a record of this magnitude, on the appellant's behalf. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.) Since Serri's counsel has failed to provide citations to the record, we shall treat this point as waived or forfeited. (*Lonely Maiden Productions, LLC v. GoldTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 384.)

We conclude that the trial court did not err when it granted summary adjudication of the emotional distress claims.

### K. Ninth Cause of Action: The Trial Court Properly Granted Summary Adjudication of Serri's Interference with Prospective Economic Advantage Claims

Serri's ninth cause of action alleges that Ottoboni and Veit interfered with her employment contract with the University by "falsely and maliciously" inducing the University to terminate her so they could take over her job for themselves. The complaint alleges they did this by defaming her: by falsely implying she was incompetent and falsely claiming she was responsible for not completing the AAP's. The complaint alleges that Ottoboni and Veit were not acting as employees of the University when they interfered with Serri's employment contract.

75

A plaintiff seeking damages for interference with prospective economic advantage must prove the following elements: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional wrongful acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. (*Korea Supply Co. v. Lockheed Martin Corp*. (2003) 29 Cal.4th 1134, 1153-1154 (*Korea*).) As for the third element, the plaintiff must prove that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." (*Id*. at p. 1153.) This requires the plaintiff to prove "intentional *wrongful* acts on the part of the defendant designed to disrupt the relationship." (*Id.* at p. 1154.) "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Id.* at p. 1158; *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1152.)

Ottoboni and Veit moved for summary adjudication of Serri's interference with prospective economic advantage claim on five grounds, including that: (1) Serri could not identify any independently wrongful act by Ottoboni or Veit that satisfied the third element of the cause of action; and (2) Serri's claim was barred by the common interest privilege, as well as (3) the coworkers privilege.[24] The trial court agreed with Ottoboni and Veit on each of these grounds and granted summary adjudication of Serri's interference with prospective economic advantage claim.

In support of her motion, Veit provided a declaration that she was never interested in Serri's job and never applied for the position. The legal associate job she obtained in

---

[24] Ottoboni and Veit also argued that (1) Serri had not identified a prospective economic advantage with which they had interfered and (2) under *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 24, Serri could not state such a claim against agents and employees of the University.

the University's human resources department was separate and distinct from the Director of Affirmative Action job and involved the same legal work Veit did as outside counsel to the University. It was undisputed that while a law degree was a preferred qualification when Serri was hired as Director of Affirmative Action, the job did not require bar membership. On the other hand, the legal associate job Veit obtained in January 2007 required both a law degree and bar membership. Veit, who had practiced employment law in both New York and California, declared that she wanted to practice law and work as an attorney. Veit stated that as outside counsel, she attended meetings with McDonald and Serri at the University's request. She also worked with Serri on sexual harassment training and provided legal advice regarding investigations Serri was handling. Veit declared that she never made any hostile or derogatory statements to Serri during their meetings, never discussed Serri's termination with anyone outside of privileged communications with her client and with outside counsel, and never harbored any malice toward Serri. Veit also relied on Serri's answers to interrogatories, which indicated that Serri was not claiming defamation by Veit. After Serri was terminated, Veit did not apply for the Director of Affirmative Action job. Instead, the University hired Hirsch to replace Serri.

In his declaration, Ottoboni stated that (1) he had been practicing law for more than 38 years, (2) he and his firm began working for the University as outside counsel in 2001, and (3) Veit joined his firm and began doing work for the University in 2003. Ottoboni declared that he became the University's general counsel in 2006, he did not create the position of legal associate in the human resources department, was not involved in the decision to hire Veit for that job, and Veit did not report to him after she was hired. He declared that he never wanted, applied for, or attempted to obtain Serri's job and that he never took any action to facilitate Veit obtaining Serri's job or its related duties and benefits. He also stated that within a month of Serri's termination, the University began the search process for a new Director of Affirmative Action. Because

77

federal regulations required the University to designate someone to be responsible for the Affirmative Action Program, the University named him as interim Director of Affirmative Action. A nine-person search committee conducted a nationwide search for Serri's replacement and selected Hirsch, who started working for the University in October 2007.

On appeal, Serri relies primarily on the deposition testimony of Jane Curry. Curry testified that she met with Veit while Veit was investigating an issue Curry had raised. At the beginning of their meeting, they engaged in "small talk." Curry testified that Veit said "she really liked" the University, and that she had a new baby and wished she had Serri's job so she could use the University's daycare facility because it had a good infant care program.[25] Citing this testimony, Serri argues that she "produced evidence that . . . Ottoboni was seeking to become [the University's] general counsel and to accomplish that by taking over some of Ms. Serri's investigative duties or creating a position for his daughter, . . . Veit, which took some of Serri's investigative duties." Serri also argues that both Ottoboni and Veit "were successful in their contract interference efforts" and obtained direct employment with the University, "which took away some of Ms. Serri's investigative duties." But Serri does not provide a record citation that supports her contention that her investigative duties changed after Ottoboni was hired as general counsel in the fall of 2006 or after Veit started working for the University on January 23, 2007, or that disputes Defendants' evidence that her job and Veit's job were separate and distinct from one another.

While Curry's testimony supports an inference that Veit wished she had Serri's job so she could have access to the University's day care program, that inference is

---

[25] Although Curry testified that she met with Veit in 2006 or 2007, a reasonable inference from her testimony is that the meeting occurred while Veit was working for the University as outside counsel since Veit had access to the University's day care program after she became an employee of the University.

dispelled by evidence that Veit obtained a different job at the University that was more suited to her experience, qualifications, and desire to continue practicing law. That inference is also dispelled by evidence that neither Veit nor Ottoboni ever obtained Serri's job and that after Serri was terminated the University hired Hirsch, not Ottoboni or Veit, to replace her. Moreover, evidence that Veit told Curry, while engaged in small talk, that she wished she had Serri's job does not rise to the level of an "intentional *wrongful* act" that was designed to disrupt Serri's employment relationship that was "wrongful by some legal measure other than the fact of interference itself." (*Korea*, *supra*, 29 Cal.4th at pp. 1154, 1158.)

Serri's brief on appeal focuses on the coworker's privilege (a defense Ottoboni and Veit relied on) and the manager's privilege (a defense Ottoboni and Veit did not raise), but does not provide any reasoned argument or point to any evidence in the record that Ottoboni and Veit engaged in intentional wrongful acts that were designed to disrupt Serri's employment relationship with the University.

Serri's relies, in part, on a privilege log that the University submitted during discovery. Serri argues that "Ottoboni and Veit were in numerous meetings with [Father] Locatelli, Warren and others (which communications they refused to disclose) at the time [the University] was deciding to terminate Serri and it can be reasonably inferred that they were advocating termination." Serri cites 10 documents on the privilege log (all but one of which are e-mails) that the University refused to produce on the grounds that they were protected by the attorney-client or attorney work product privileges or both. Since Serri did not challenge the University's claims of privilege by filing a motion to compel below, she has forfeited any challenge to the exercise of these privileges on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2, superseded by statute on another ground as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) Moreover, a privilege log is not evidence and Evidence Code section 913 precludes us from drawing any inferences from the exercise of a privilege.

The only other evidence Serri cites regarding her ninth cause of action are (1) the job posting for the legal associate position that Veit obtained; (2) e-mails Serri sent to Ambelang and McDonald in early January 2007 with questions and complaints about the University's posting of the position[26]; (3) Ottoboni's deposition testimony that the AAP consultant the University hired after Serri left knew the University did not have an AAP for "the year that he was going to do"; and (4) Ottoboni's testimony that he knew independent investigator Manchester from the legal community. Apart from *citing* this evidence, Serri does not *argue or explain how* it supports a finding that Ottoboni and Veit engaged in intentional wrongful acts that satisfy the third element of her cause of action.

Furthermore, the job posting did not state that the legal associate to human resources was taking over the functions of the Director of Affirmative Action. The questions, accusations, and fears that Serri expressed in her January 4, 2007 e-mail to McDonald, weeks before Veit was hired, do not create a triable issue or dispute Ottoboni's and Veit's evidence that the two jobs were separate and distinct. There was nothing wrongful about telling the person hired to complete the AAP that the University did not have an AAP, and there was nothing wrongful in retaining counsel that Ottoboni knew from the legal community to conduct an investigation on behalf of the University.

We conclude that Ottoboni and Veit met their burden of showing that Serri could not prove the third element of her cause of action for interference with prospective

---

[26] In her 2-page e-mail of January 4, 2007, Serri complained to McDonald that she felt "insulted and demeaned" because the University posted the position without consulting her. She questioned the job requirement that the person be a member of the bar and argued that bar membership bore no reasonable relationship to the job. Serri asked why the University needed another lawyer in addition to Ottoboni and Veit, and said it was "absurd" to have the person report to human resources rather than the general counsel. She asserted that certain functions of the job overlapped with her position and that the job posting stripped her of her duties. Serri stated, "Your secret plotting behind my back to create this position and ignore my input is insulting and demoralizing, let alone discriminatory and retaliatory." As Director of Affirmative Action and compliance officer, she "demand[ed]" answers to nine questions about the job.

economic advantage because there was no evidence they engaged in intentional wrongful acts that were designed to disrupt Serri's employment relationship with the University. We also conclude that Serri has not met her burden of establishing there was a triable issue of material fact regarding this third element, and that the trial court therefore properly granted summary adjudication of this cause of action. In light of our conclusions, we need not address Serri's contentions regarding the privileges that Ottoboni and Veit asserted as alternate grounds for their motions.

## L. The Trial Court Properly Granted Summary Judgment

Since the court properly granted summary adjudication of each of Serri's causes of action, it properly granted summary judgment in this case.

### DISPOSITION

The judgment is affirmed.

 

 

Márquez, J.

WE CONCUR:

Rushing, P.J.

Elia, J.

81

Trial Court: Santa Clara County Superior Court
Superior Court No.: 107 CV 088296

Trial Judge: The Honorable Mark H. Pierce

Attorneys for Appellant
Conchita Franco Serri: Law Office of Samuel Kornhauser

Samuel Kornhauser

Attorneys for Respondents
Santa Clara University: Skadden, Arps, Slate, Meagher & Flom LLP

Allen Ruby
Thomas V. Christopher
Raoul Kennedy

Attorneys for Respondents
Robert Warren, Molly McDonald, John Ottoboni and Julie Veit: Covington & Burling LLP

Sonya D. Winner
Philip A. Scarborough